**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WILLIAM BERNAL; CELIA
BERNAL,

*Plaintiffs-Appellants*,

v.

SACRAMENTO COUNTY
SHERIFF'S DEPARTMENT;
HINKLEY, Sacramento County
Sheriff Deputy; SCOTT JONES,
Sacramento County Sheriff;
RANCHO CORDOVA POLICE
DEPARTMENT; FOLSOM POLICE
DEPARTMENT; BRADSHAW,
Folsom Police Officer; COUCH,
Sergeant; WINKEL, Sacramento
County Sheriff Deputy; KENNEDY,
Sacramento County Sheriff Deputy;
SUTTER, Sacramento County Sheriff
Deputy; CHHLANG, Sacramento
County Sheriff Deputy; BLISS,
Sacramento County Sheriff Deputy;
QUACKENBUSH, Sacramento
County Sheriff Deputy,

*Defendants-Appellees*.

No. 22-15690

D.C. No.
2:19-cv-00482-
MCE-AC

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted March 31, 2023
San Francisco, California

Filed July 7, 2023

Before:  Ronald M. Gould and Sandra S. Ikuta, Circuit
Judges, and James V. Selna,[*] District Judge.

Opinion by Judge Selna

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in favor of Sacramento County Sheriffs' Deputies in a 42 U.S.C. § 1983 action that presents the question of whether and to what extent law enforcement may detain people who are not suspected of engaging in criminal activity but who have information essential to preventing a threatened school shooting.

---

[*] The Honorable James V. Selna, United States District Judge for the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The Deputies encountered Celia and William Bernal (collectively "the Bernals") at their home during the Deputies' investigation into allegations that the Bernals' son Ryan planned a shooting at his school that day. During the interaction, the Deputies held Celia's arms and used a twist-lock to prevent her from leaving. The Deputies also pointed a firearm at William, forcibly restrained him, and put him in handcuffs.

The district court held that the Deputies did not violate the Fourth Amendment by detaining the Bernals even in the absence of reasonable suspicion. The district court further found that the Deputies did not use excessive force during the Bernals' detention and, even if they had, qualified immunity applied.

Tha panel first considered whether the initial seizure of the Bernals was reasonable. Because the Bernals were detained but not arrested, the reasonableness of their detention depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. To justify the suspicionless seizure of a material witness, there must be exigencies requiring immediate action, the gravity of the public interest must be great, and the detention must be minimally intrusive. Applying these principles, the panel held that the Deputies had limited authority to briefly detain and question the Bernals about Ryan's location due primarily to the exigencies inherent in preventing an imminent school shooting. This holding was predicated on two key facts: first, the Deputies knew the Bernals had information crucial to stopping a potential mass shooting— the suspected shooter's location; and second, there was an ongoing emergency threatening numerous lives which required immediate action. The panel further held that it

need not set a definitive rule for the maximum length a non-suspect witness detention may last because the detention here lasted approximately twenty minutes, far less than previous detentions that the court has considered. The Deputies' continued detention of Celia after she informed the Deputies she did not want to speak with them did not exceed this boundary. William's initial detention was likewise permissible, up to a point.

The panel next considered the Bernals' Fourth Amendment claims of excessive force. The district court found the amount of force used against both Celia and William reasonable under the circumstances. The panel concluded that the district court was correct in its analysis regarding Celia but erred as to William.

First, as to Celia, the panel held that the nature and quality of the Deputies' intrusion was slight because the Deputies utilized a minimal amount of force on Celia. Moreover, the Deputies utilized warnings and less intrusive means before resorting to physical coercion. Weighing the Deputies' minimal use of force against the government's interests, the panel applied the factors outlined in *Graham v. Connor*, 490 U.S. 386, 396 (1989). Factors considered in analyzing the government's interest include: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape. The panel weighed the first *Graham* factor slightly in favor of the Deputies because, by disregarding the Deputies' commands, Celia prolonged a dire emergency situation. The panel weighed the second and most important *Graham* factor in favor of Celia because merely being behind the wheel of an operational vehicle does not automatically create a safety

hazard; any threat to officer safety was minimal and quickly mitigated. The panel weighed the third *Graham* factor in favor of the Deputies because Celia was uncooperative, and refused to comply with the Deputies' requests to exit the vehicle. Only then did the Deputies restrain her, using holds on both her arms. The panel held that this type of minimal force was reasonable to prevent continued resistance or flight. On balance, the panel concluded that the Deputies' use of force against Celia was reasonable under the circumstances.

Next, the panel concluded that the district court erred in finding that the Deputies' use of force against William was not excessive. The intrusion on William's liberty was too great in the context of detaining a non-suspect witness. According to William, the Deputies pointed a gun at him, kicked his legs apart, turned his head beyond its natural range of motion, kicked his knees to force his legs to buckle, smashed his head into the hood of the car, and tightly handcuffed him, resulting in a great deal of pain. Applying the *Graham* factors, the first *Graham* factor weighed in favor of Deputies, but only slightly. The Deputies did not suspect William of committing a crime when they first arrived at the Bernals' home, and asserted they had probable cause to arrest William when he physically resisted their attempts to detain him. Viewing the evidence in the light most favorable to the Bernals, the panel found a triable issue of fact regarding whether the Deputies' commands to William were lawful because verbally challenging and recording officers are not illegal actions, and thus commands to cease such actions are not lawful orders. Nevertheless, the unfolding emergency of a threatened school shooting must be taken into account. The second and most important *Graham* factor weighed in favor of William because a genuine dispute of

material fact remained as to whether William reached into an unsearched bag, and the undisputed facts reflected that the Deputies knew William was unarmed, undermining their claim that they feared for their safety.  On the third *Graham* factor, to the extent William actively resisted the Deputies' attempts to restrain him, this factor weighed only slightly in favor of the Deputies.  Weighing all relevant factors, the panel found that the district court erred in granting summary judgment to the Deputies by disregarding genuine disputes of material fact.  The panel also found that the Deputies used excessive force when they violently detained William despite knowing he was unarmed and posed no reasonable threat to officer safety.

Having found that the Deputies violated William's Fourth Amendment rights, the panel considered whether the Deputies were nonetheless entitled to qualified immunity.  The panel concluded that the Deputies violated clearly established law whether they accepted the Bernals' or the Deputies' account of events.  Viewing the evidence in the light most favorable to the Bernals, William never reached into his bag, and instead yelled at the Deputies to stop assaulting his wife and attempted to record the Deputies.  Williams' recording of the incident and his verbally challenging of the police were not only legal actions but were protected by the First Amendment.  Even if the Deputies' account of events is taken as true, the Deputies were on notice that merely reaching into an unsearched bag, without more, could not reasonably lead to an inference that William was armed such that the use of force was justified.  Finally, once it became apparent that William held a cell phone, and not a weapon, the officers were on notice they could not violently restrain him.

Accordingly, the panel affirmed the district court's grant of summary judgment as to Celia and reversed as to William. Because the panel reversed the district court's grant of summary judgment on William's Fourth Amendment claims, it reinstated William's pendent state law claims.

## COUNSEL

Matthew Becker (argued), Becker Law Practice, Sacramento, California, for Plaintiffs-Appellants.

Nicole M. Cahill (argued) and Van Longyear, Longyear & Lavra LLP, Sacramento, California, for Defendants-Appellees.

## OPINION

SELNA, District Judge:

This case asks us to decide the extent of law enforcement officers' authority to detain non-suspect witnesses, and how much force, if any, may be used to effectuate such detentions. Six Sacramento County Sheriffs' Deputies (collectively "the Deputies") encountered Celia and William Bernal (collectively "the Bernals")[1] at their home during the Deputies' investigation into allegations that the Bernals' son

---

[1] Because this case involves multiple members of the Bernal family, we will refer to each Bernal by their first name (*e.g.*, Celia, William, or Ryan) when discussing them individually and "the Bernals" when discussing them collectively.

Ryan planned a shooting at his school that day. During the interaction, the Deputies held Celia's arms and used a twist-lock to prevent her from leaving. The Deputies also pointed a firearm at William, forcibly restrained him, and put him in handcuffs. Based on these actions, the Bernals filed a lawsuit under 42 U.S.C. § 1983 against the Deputies and the Sacramento County Sheriff's Department alleging, among other things, violations of their Fourth Amendment rights.

The district court granted summary judgment in favor of the Deputies, concluding the Deputies did not violate the Fourth Amendment by detaining the Bernals even in the absence of reasonable suspicion. The district court further found that the Deputies did not use excessive force during the Bernals' detention and, even if they had, qualified immunity applied. We affirm in part and reverse in part.

## FACTUAL BACKGROUND

At approximately 10:00 a.m. on March 5, 2018, six deputies from the Sacramento County Sheriff's Department responded to a request for help in finding Ryan Bernal, a student at Vista Del Lago High School who was absent that day. The Folsom Police Department received information that Ryan sent a text to his friend saying he intended to "shoot up the school, and today [March 5, 2018] was the day." Deputies Winkel, Kennedy, Couch, Sutter, Chhlang, Bliss, and Quackenbush, all of whom were in uniform, responded to the call.

The Deputies met in a parking lot near the Bernals' home for approximately ten minutes to coordinate their efforts and gather more information. Deputy Chhlang performed a premises history check on Ryan's residence which identified Celia and William, whom the Deputies presumed to be Ryan's parents, as residents of the home. Deputy Winkel

performed a weapons check on the home which showed no firearms registered to the address or in any of the Bernals' names.

Deputy Chhlang called Celia, identified himself as a deputy with the Sacramento County Sheriff's Office, informed Celia about the threats Ryan allegedly made, and asked to speak with Ryan. Celia responded that Ryan was not at home but was at his grandmother's house. She refused to provide the address. According to Celia, she did not give Ryan's location because the number Deputy Chhlang called from was blocked. Since she could not verify whether Deputy Chhlang was, indeed, a member of law enforcement, she did not want to give a stranger her son's location.

The Deputies proceeded to the Bernals' home in six marked patrol cars and parked around the cul-de-sac in front of the house. As the Deputies walked up to the Bernals' driveway, they saw Celia and William exiting the home and heading towards their car. They did not see Ryan or anyone matching his description. The Deputies intended to briefly detain the Bernals to ask them about Ryan's location.

### A. Celia's Interaction with the Deputies

Deputies Chhlang and Kennedy approached Celia, who appeared agitated and was talking very loudly. Deputies Chhlang and Kennedy identified themselves as law enforcement and asked to speak to her. Celia again informed the Deputies that Ryan was not at home, stated she did not want to speak to them any further, and proceeded to enter her vehicle. Deputy Kennedy stood behind Celia's car and ordered her to stay out of her vehicle; she ignored him and got in. Deputy Kennedy then ordered Celia to exit the vehicle, but she again ignored him and remained inside.

The parties dispute whether Celia actually started the car, but at least two deputies saw that the vehicle's tail lights had illuminated. Believing the car to have started, Deputy Kennedy, still behind the vehicle, tapped on the rear window to warn Celia not to back up, then moved to the driver's side. Deputy Kennedy reached through the driver's side window to remove the keys from the car, but Celia blocked him from doing so. Deputies Kennedy and Chhlang proceeded to take hold of Celia's left forearm while Deputy Winkel held Celia's right arm from the passenger side in a twist lock.[2] Celia called out for William to record the Deputies restraining her. After William had been handcuffed, Celia stopped resisting. Deputies Winkel and Kennedy removed her from her car and told her to sit in a plastic chair in her yard. Celia was not placed in handcuffs.

## B.  William's Interaction with the Deputies

As Deputies Chhlang, Kennedy, and Winkel spoke to and restrained Celia, William, standing at 6 feet 3 inches and weighing 290 pounds, was in front of Celia's car and placed a small duffel bag on the hood. The parties present differing accounts of what happened next.

According to the Bernals, William did not reach into the bag and instead had his cell phone in his hands from the time he stepped out of his house until he was placed in handcuffs. When Celia told William to record the Deputies' use of force against her, William held his cell phone with both hands to record the interaction and yelled at the officers to stop touching Celia. Celia stated that she was watching William

---

[2] A twist-lock is a type of control hold which uses pain to gain control. After a twist-lock is applied, most people bend forward on account of the pain.

the entire time and saw that he never reached into the bag on the car's hood.

According to Deputy Bliss, who stood at approximately 5 foot 7 inches and weighed 160 pounds, William "aggressively" reached into the bag. Worried that William could be retrieving a weapon, Deputy Bliss aimed his firearm at William, ordering him to put his hands up. William did not comply and instead continued yelling, pulled out his cell phone from the bag, and raised it with both hands. Deputy Bliss recognized the cell phone was not a weapon, holstered his firearm, and helped Deputy Chhlang, approximately the same size as Deputy Bliss, get William's hands behind his back. Deputy Chhlang reported a similar account of events, including that he saw William reach into the bag, heard Deputy Bliss tell William to take his hands out of the bag and raise them, and saw that William was holding a cell phone, not a weapon.

Another deputy and a third party also recalled William's use of his phone. Deputy Winkel reported hearing William say "he was going to record the whole thing." Gary Turner, a third-party witness, stated that he saw William holding his phone, filming the deputies, and yelling. Turner further recalled that the Deputies told William to put his phone away and calm down.

Importantly, the parties do not dispute that the Deputies quickly recognized the object he held was a cell phone and not a weapon. Despite acknowledging that William had not retrieved a weapon, the Deputies proceeded to forcibly restrain William. In addition to wrenching William's arms behind his back, the Deputies pushed William's head into the hood of the car. William also stated that the Deputies kicked his legs apart and forced his knees to buckle, putting

the full force of his torso on the hood of the car and forcing his head to turn past its natural range of motion. Deputies Bliss and Chhlang contended they did not touch his legs or knees.

As he was attempting to handcuff William, Deputy Chhlang felt William elbow him in the chest. Deputy Chhlang interpreted this as resistance and pushed William forward onto the hood of Celia's car to gain leverage and utilized a rear twist-lock. William later stated he did not hit any of the Deputies, although he did recall twisting away from the Deputies' holds to relieve the pain from his surgically repaired shoulders.

As the Deputies restrained William, Celia yelled that they were hurting William due to his recent surgery. After the Deputies initially handcuffed William, they used a second pair of handcuffs to create a "daisy chain," allowing William's shoulders more room. The Deputies then placed William in the back of one of their squad cars for less than ten minutes. In total, the interaction lasted approximately twenty minutes.

After restraining William and Celia, the Deputies confirmed that Ryan was at his grandmother's house. William provided the address, and the Bernals led the Deputies to Ryan's grandmother's house at approximately 10:45 a.m. Ryan was arrested by the Folsom Police Department and pleaded no contest to a misdemeanor violation of California Penal Code Section 422 for making threats to commit a crime resulting in death or great bodily injury to another person. He was also charged with, but was not convicted of and did not plead guilty to, unlawfully possessing a firearm.

## PROCEDURAL BACKGROUND

The Bernals filed suit in the United States District Court for the Eastern District of California against the Deputies and the Sacramento County Sheriff's Department alleging, among other things, violations of their Fourth Amendment rights.  The Deputies moved for summary judgment on all claims.  The district court granted the Deputies' motion as to the federal claims, finding no genuine dispute of material fact that the initial seizure and the Deputies' use of force were reasonable.  In addressing qualified immunity, the district court stated in a footnote that, even if a jury found the seizure or use of force unreasonable, qualified immunity would apply because the Bernals had failed to present any on-point cases.  The court declined to exercise supplemental jurisdiction over the Bernals' pendent state law causes of action.  The Bernals now timely appeal the district court's grant of summary judgment on their Fourth Amendment claims.

## STANDARD OF REVIEW

On appeal, a district court's ruling on a motion for summary judgment is reviewed *de novo*, viewing all evidence in the light most favorable to the non-moving party. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Del. Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1119 (9th Cir. 2008).  A district court's ruling on whether an officer is entitled to qualified immunity is also reviewed *de novo*.  *Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011).

## DISCUSSION

The Bernals argue the district court erred by finding their initial seizure reasonable, the Deputies' use of force

reasonable, and that qualified immunity applied. We address each argument in turn.

### A.  Fourth Amendment Claim for Unreasonable Seizure

The Fourth Amendment guarantees the right of the people to be free from unreasonable seizures. U.S. CONST. amend. IV.  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

In safeguarding this right, the Fourth Amendment protects individuals from both unreasonable detentions and excessive force used during the detention. *See Torres v. Madrid*, 141 S. Ct. 989, 995 (2021).  The rule defining when the Fourth Amendment permits seizures is well-established: absent an exception, the government may not detain an individual unless there is, at a minimum, reasonable suspicion the individual is engaging in criminal activity. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975); *Terry*, 392 U.S. at 21.

It is undisputed that the Bernals were detained within the meaning of the Fourth Amendment and that, prior to their initial seizure, the Bernals were not suspected of any criminal wrongdoing.  The controversy, then, is whether their seizure was reasonable notwithstanding the lack of reasonable suspicion.  Because the Bernals were detained but not arrested, the reasonableness of their detention "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Brown v. Texas*, 443 U.S. 47,

51 (1979) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam)).  Thus, we weigh "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.*

## 1. Legal Framework

This case presents a particularly unique question: whether and to what extent law enforcement may detain people who are not suspected of engaging in criminal activity but who have information essential to preventing a threatened school shooting.  Generally, when no reasonable suspicion exists, police have no authority to detain. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000).  However, the Supreme Court has recognized an exception to this general rule in certain circumstances, permitting the detention of non-suspect witnesses for the purpose of obtaining information. *See Illinois v. Lidster*, 540 U.S. 419, 423–24 (2004).   In contemplating this exception, we concluded that the government's interest is greatly decreased when detaining non-suspect witnesses. *See Maxwell v. County of San Diego*, 708 F.3d 1075, 1084 (9th Cir. 2013) (en banc).   Thus, until now, we have not upheld a suspicionless witness detention because the government's interests in solving crime did not outweigh the individuals' liberty interests. *See id.*; *United States v. Ward*, 488 F.2d 162, 169 (9th Cir. 1973) (en banc).

We first explored whether law enforcement may detain a witness for the purpose of questioning them about the crime of a third person in *Ward*.  488 F.2d at 169.  There, FBI agents searching for federal fugitives wanted to question a motorist whom they believed had information relevant to their investigation. *Id.* at 163.   Considering the unique

factual nature of the case, we held the seizure unconstitutional for three reasons. First, the agents made the stop not "in connection with any particular crime," but rather "pursuant to a general criminal investigation that had begun several months before." *Id.* at 169. Accordingly, "[t]here was no emergency situation nor any need for immediate action." *Id.* Second, we acknowledged the different scopes of responsibility between federal agents, who only enforce federal laws, and local law enforcement officers, who typically conduct traffic stops "as guardians of the peace generally." *Id.* Third, "and most significantly," the agents did not suspect the motorist himself of engaging in criminal activity. *Id.* Rather, the stop "was made for the purpose of questioning the defendant about a *third person*." *Id.* (italics in original).

Forty years later, we explored this question for a second time. We held in *Maxwell* that detaining witnesses to a fatal shooting for five hours was an unreasonable seizure. 708 F.3d at 1084. While we noted that *Ward* left "the door open to investigatory witness detentions" in limited circumstances, such as in an unfolding emergency situation, *id.* (citing 488 F.2d at 169), we nonetheless clarified "that in the hierarchy of state interests justifying detention, the interest in detaining [non-suspect] witnesses for information is of relatively low value," *id.* In concluding that the government's interest did not outweigh the plaintiffs', we found particularly relevant the length of the detention and the fact that there was no ongoing emergency because the crime had been solved. *Id.*

Supreme Court precedent confirms that, while detentions solely for the purpose of obtaining information may be permissible in very limited cases, the government's interest in effectuating such seizures is at a low ebb. In *Lidster*, the

Supreme Court held that a traffic checkpoint in which police briefly detained all motorists in a specific area to inquire about a fatal hit-and-run incident did not run afoul of the Fourth Amendment.    540 U.S. at 427.    The "[m]ost important[]" reason for the Court's holding was that "the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." *Id.*  The motorists were delayed "a very few minutes at most," contact with police "lasted only a few seconds," and the contact "consisted simply of a request for information and the distribution of a flyer." *Id.* at 427–28. Further, "the contact provided little reason for anxiety or alarm" due to the stop's brevity and the fact that "police stopped all vehicles systematically." *Id.* at 428.

Taken together, these precedents establish that, while detaining non-suspect witnesses can be permissible, the government's interest in such detentions is greatly decreased for the simple yet significant reason that police do not have individualized suspicion that the witness engaged in criminal activity.    *See Ward*, 488 F.2d at 169–70 ("Clearly, the narrow exception of *Terry v. Ohio* . . . cannot be stretched so far as to allow detentive stops for generalized criminal inquiries."). Accordingly, to justify the suspicionless seizure of a material witness, there must be exigencies requiring immediate action, the gravity of the public interest must be great, and the detention must be minimally intrusive, both in length of time and amount of force used. *See Edmond*, 531 U.S. at 44 (recognizing that suspicionless checkpoints may be permissible when certain exigencies exist, such as thwarting a terrorist attack); *Lidster*, 540 U.S. at 427 (approving of suspicionless witness detention due to the stop's minimally intrusive nature).

## 2. Initial Seizure

Applying these principles to the case before us, we hold that the Deputies had limited authority to briefly detain and question the Bernals about Ryan's location due primarily to the exigencies inherent in preventing an imminent school shooting. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, [however,] the person approached may not be detained or frisked but may refuse to cooperate and go on his way." *Terry*, 392 U.S. at 34 (White, J., concurring). We find that the emergency presented by an impending school shooting coupled with the information the Deputies knew the Bernals possessed constituted such "special circumstances."

Our holding is predicated on two key facts. First, the Deputies knew the Bernals had information crucial to stopping a potential mass shooting: the suspected shooter's location. Celia told the Deputies over the phone that Ryan was at his grandmother's house, although she did not divulge the precise address at that time. Celia's hesitance to share Ryan's grandmother's address was because she could not confirm she was speaking with law enforcement on the phone and did not want to provide Ryan's precise location to a stranger. Thus, this is not a case in which police merely suspected or believed an individual had credible information, but one in which the witness herself confirmed that she knew the location of a suspected school shooter.

Second, and most importantly, there was an ongoing emergency threatening numerous lives which required immediate action. The Deputies were actively investigating credible threats of a school shooting weeks after the devastating and highly publicized events in Parkland,

Florida.  We believe this to be precisely the type of exigency contemplated by the Supreme Court in approving suspicionless witness detentions.  *See Lidster*, 540 U.S. at 427 (finding the relevant public concern grave because "police were investigating a crime that had resulted in a human death"); *Edmond*, 531 U.S. at 44 (recognizing that suspicionless checkpoints may be permissible when certain exigencies exist, such as thwarting a terrorist attack).

This exigency separates this case from our previous cases in which the crime had already been solved, *see Maxwell*, 708 F.3d at 1084, or there was no crime to solve, *see Ward*, 488 F.2d at 169; *see also Hill v. City of Fountain Valley*, No. 21-55867, slip op. at 14 (9th Cir. June 1, 2023) (finding that an "exigent circumstance in investigating a potentially kidnapped woman" justified ordering the suspected kidnappers' family members out of their home).  We are hard-pressed to imagine a more important, time-sensitive matter than preventing the unspeakable tragedy of a school shooting.  Thus, while the government's interest in detaining non-suspect witnesses begins at a low ebb, the fact that the Deputies were actively attempting to prevent a mass shooting at a school sufficiently increased the government's interest to warrant a brief detention.

Even still, the Bernals' liberty interests remained very high, as they were not themselves suspected of engaging in any criminal activity.  *See Maxwell*, 703 F.3d at 1084.  Accordingly, the detention must be brief, ending after it is clear the witness is not willing to divulge the information sought.  *See Davis v. Mississippi*, 394 U.S. 721, 727 n.6 (1969) (noting that witnesses may not be compelled to answer law enforcement officers' questions).  The longer a witness refuses to answer questions, the less the government maintains an interest in the interaction.  Similarly, the longer

the government detains non-suspect witnesses, the more the detention interferes with liberty of the sort the Fourth Amendment seeks to protect. *See Lidster*, 540 U.S. at 427.

We need not set a definitive rule for the maximum length a non-suspect witness detention may last because the detention here lasted approximately twenty minutes, far less than previous detentions we have considered. *See, e.g.*, *Maxwell*, 708 F.3d at 1084 (finding witnesses' detention of five hours unreasonable). Our sister circuits addressing this issue have reached similar conclusions regarding the length of witness detentions. *See, e.g.*, *Lincoln v. Scott*, 887 F.3d 190, 197 (5th Cir. 2018) (detaining a non-suspect witness for two hours in handcuffs in a police car is unreasonable); *Lincoln v. Turner*, 874 F.3d 833, 845 (5th Cir. 2017) (same); *Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007) (en banc) (detaining non-suspect witness for one hour is unreasonable); *Walker v. City of Orem*, 451 F.3d 1139, 1150 (10th Cir. 2006) (detaining non-suspect witnesses for ninety minutes is unreasonable).

The Deputies' continued detention Celia after she informed the Deputies she did not want to speak with them did not exceed this boundary. The time in which the Deputies attempted to ask Celia questions was very brief, lasting only a few seconds. Indeed, the record reflects the Deputies had only one opportunity to ask Celia if she would speak with them before she attempted to drive away. In light of the unique exigencies inherent in preventing a school shooting, we determine that law enforcement was permitted a few minutes in which to ask questions. Requiring Celia to remain at her home for those few minutes does not exceed the bounds of the Fourth Amendment.

William's initial detention was likewise permissible, up to a point. As with Celia, the Deputies had limited authority to briefly detain William for the purpose of asking him questions about Ryan's location. However, as we discuss further below, the Deputies exceeded this authority when they used a significant amount of force to restrain William who was unarmed and compliant with the Deputies' lawful orders.[3]

Application of the *Brown* factors further supports our conclusion. First, the "gravity of the public concerns served by the seizure" could hardly have been weightier. *Brown*, 443 U.S. at 51. Ryan threatened to commit a mass shooting at his school that day, rendering finding his location a highly time-sensitive public matter. Additionally, this threat occurred less than three weeks after a student at the Marjory Stoneman Douglas High School in Parkland, Florida killed seventeen people and injured seventeen more. Second, detaining and speaking to the Bernals advanced the public interest to the highest degree—locating the suspected school shooter. *See id.* Finally, while the Deputies undoubtedly

---

[3] The Deputies assert that William's refusal to comply with their commands constituted resistance and provided probable cause to arrest under Section 148 of the California Penal Code separate and apart from their authority to detain him as a witness. However, when viewing the facts in the light most favorable to the Bernals, William only disregarded unlawful commands to stop yelling at and recording the Deputies, which "does not rise to the level of a [S]ection 148 violation." *In re Chase C.*, 196 Cal. Rptr. 3d 381, 388 (Ct. App. 2015). "Speech is generally protected by the First Amendment, even if it is intended to interfere with the performance of an officer's duty, provided no physical interference results." *Id.* (citation and quotation marks omitted). Because William engaged in protected First Amendment conduct and did not physically interfere with the Deputies' performance of their duties, the Deputies did not have probable cause to arrest him under Section 148.

interfered with the Bernals' individual liberty, the initial seizure was not so disproportionately intrusive as to outweigh the other considerations. *See id.*  We note that our conclusion on the final *Brown* factor is based solely on the initial detention; we separately assess the use of force employed below.

The Bernals contend that whatever authority the Deputies had to detain them terminated when Celia indicated she did not wish to continue speaking with the Deputies.  In arguing so, the Bernals rely on *Florida v. Royer*, 460 U.S. 491 (1983).  There, the Supreme Court held that a person approached by police "need not answer any question put to him . . . he may decline to listen to the questions at all and may go on his way." *Id.* at 497–98.

However, *Royer* is inapposite because the quoted language refers to a different situation, where a law enforcement officer is "merely approaching an individual on the street or in another public place" without "convert[ing] the encounter into a seizure requiring some level of objective justification." *Id.*  Under those circumstances, the person approached "may go on his way" without answering the questions, and the refusal to do so, "without more" does not "furnish . . . grounds" to use force to detain the person any further. *Id.* at 498.  Here, conversely, the Deputies had authority to detain and question the Bernals about Ryan's location due to exigent circumstances.  The objective justification giving the Deputies authority to briefly detain the Bernals also justifies the use of limited force to prevent the Bernals from going on their way. *Id.*

Thus, we hold that the Deputies could briefly detain the Bernals because of the ongoing, time-sensitive investigation

into a threatened school shooting about which the Bernals had vital information.

### B.  Fourth Amendment Claim for Excessive Force

The Bernals next argue that the district court erred in granting summary judgment to the Deputies on the claims for excessive force.  The district court found the amount of force used against both Celia and William reasonable under the circumstances.  We conclude the district court was correct in its analysis regarding Celia but erred as to William.

As a threshold matter, we recognize that "the right to [detain] necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  However, any use of force must be reasonable under the circumstances. *Id.*   To assess objective reasonableness, we balance the nature and quality of the intrusion against the government's interests.  *O'Doan v. Sanford*, 991 F.3d 1028, 1037 (9th Cir. 2021) (citing *Graham*, 490 U.S. at 396).  Factors considered in analyzing the government's interest include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape."  *Maxwell*, 708 F.3d at 1086 (citing *Graham*, 490 U.S. at 396).  These factors are not exclusive, and we consider "whatever specific factors may be appropriate in a particular context, whether or not listed in *Graham*."  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).  "Underlying *Graham*'s objective-reasonableness test is the clear principle that the force used to [to effectuate a detention] must be balanced against the

need for force: it is the *need* for force which is at the heart of the *Graham* factors." *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (internal quotation marks omitted).

We address the specific factual circumstances of the Deputies' use of force against Celia and William in turn.

### 1.   Use of Force Against Celia

### a.   **Nature and Quality of the Intrusion**

In assessing the reasonableness of the use of force against Celia, we look first to the nature and quality of the intrusion on her liberty. *See Graham*, 490 U.S. at 396.  We determine that the intrusion was slight because the Deputies utilized a minimal amount of force on Celia.  When Celia disregarded the Deputies' commands to remain outside of her vehicle, three Deputies restrained both her arms to prevent her from leaving.  Deputy Kennedy used the greatest amount of force, utilizing a "twist-lock" on Celia's right arm.  Even still, a twist-lock is one of the least intrusive control holds available. *See Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (approving of officers' use of the "arm bar" and "wrist lock" positions to secure an uncooperative individual).  Furthermore, the Deputies restrained Celia for no more than a few minutes, releasing her after she stopped attempting to leave.  She was then permitted to sit in a chair in her lawn, unhandcuffed.

Moreover, the Deputies utilized warnings and less intrusive means before resorting to physical coercion. *See Rice v. Morehouse*, 989 F.3d 1112, 1122 (9th Cir. 2021) (considering whether there were "less intrusive alternatives to the force employed and whether proper warnings were given").  The undisputed facts reflect that the Deputies

issued orders to Celia to stay out of and then exit her vehicle, both of which she disregarded.  Deputy Kennedy then reached through the driver's side window to remove the car keys, but Celia prevented him from doing so.  Only at this point did the Deputies resort to using force, and even then, only a small amount.

### b.  Severity of the Crime at Issue

We now weigh the Deputies' minimal use of force against the government's interests.  The first *Graham* factor addresses the severity of the crime at issue.  *See Graham*, 490 U.S. at 396.  When analyzing this factor, we typically look to the alleged crime of the person being detained.  *See, e.g.*, *Mattos*, 661 F.3d at 449 (considering the plaintiff's alleged crime of obstruction rather than the crime of domestic violence to which police responded); *Nelson v. City of Davis*, 685 F.3d 867, 879–80 (9th Cir. 2012) (declining to consider the potential crime of trespass and disturbance to which police responded when the plaintiff himself did not commit a crime).  "Where officers are presented with circumstances indicating that no crime was committed, the 'severity of the crime at issue' factor is necessarily diminished as a justification for the use of force." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015).  However, when police are responding to an ongoing emergency, we consider the "serious—indeed, life-threatening—situation . . . unfolding at the time." *Ames v. King Cnty.*, 846 F.3d 340, 349 (9th Cir. 2017); *cf. Nelson*, 685 F.3d at 880 (finding "the lack of serious criminal behavior" and "the absence of exigency . . . significantly reduce[d] the governmental interest involved" and provided "minimal, if any, justification for the use of force").

It is undisputed that the Deputies did not suspect Celia of committing a crime when they first arrived at the Bernals' home.  At most, Celia resisted the Deputies' orders to remain outside of her vehicle.  Disregarding an officer's lawful commands, "while a legally-punishable offense, is a minor infraction that justifies, at most, only a minimal use of force." *Nelson*, 685 F.3d at 880 (citing *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007)).  However, when viewed in light of the time-sensitive, actively unfolding emergency of a threatened school shooting, the severity of the crime increases.  By disregarding the Deputies' commands, Celia "prolong[ed] a dire" emergency situation.  *Ames*, 846 F.3d at 348–49.  We therefore weigh the first *Graham* factor slightly in favor of the Deputies.

### c.   Threat to Deputies' Safety

The second and "most important" *Graham* factor asks whether Celia presented an immediate danger to the Deputies or others.  *Graham*, 490 U.S. at 396; *see also Ames*, 846 F.3d at 349. The district court found that Celia might pose a risk to officer safety because she was at the wheel of an operational vehicle behind which Deputy Kennedy was momentarily standing.  However, merely being behind the wheel of an operational vehicle does not automatically create a safety hazard.  *See Mattos*, 661 F.3d at 444 (noting that the plaintiff, while "behind the wheel of her car . . . was not physically threatening").  Furthermore, any threat to officer safety was minimal and quickly mitigated.  Although at one point Deputy Kennedy stood behind Celia's vehicle, he promptly moved to the driver's side door.  Accordingly, we weigh the second factor *Graham* factor in favor of Celia.

### d.  Active Resistance or Attempt to Flee

Finally, we look to whether Celia actively resisted or attempted to flee.  *See Graham*, 490 U.S. at 396.  The Bernals argue that Celia was not resisting a lawful detention or attempting to escape from custody when Deputies employed force.  However, the undisputed facts counsel otherwise.  Celia was in her car, intent on leaving.  As analyzed above, the Deputies had authority to briefly detain Celia.  Pursuant to that authority, the Deputies first ordered Celia to not get in her car, then ordered her to exit her car, then attempted to retrieve Celia's keys from her car to prevent her from leaving.  Celia remained uncooperative, refusing to comply with the Deputies' requests to exit the vehicle.  Only then did the Deputies restrain her, using holds on both her arms.

We and our sister circuits have held this type of minimal force reasonable to prevent continued resistance or flight. *See, e.g.*, *Ames*, 846 F.3d at 349; *Fitzgerald*, 707 F.3d at 734. Moreover, it is unlikely that officers could have used less force than briefly holding Celia's arms to restrain her.  The Deputies never handcuffed Celia and allowed her to sit in a chair in her yard while William was in the Deputies' patrol vehicle.  We therefore weigh the third *Graham* factor in favor of the Deputies.

On balance, we conclude the Deputies' use of force against Celia was reasonable under the circumstances.  The authority to detain Celia "necessarily carrie[d] with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.  Because the government's interest in detaining Celia, as a non-suspect witness, was at a low ebb, so too was the accompanying right to use physical force.  Thus, because the undisputed facts

indicate the Deputies briefly applied among the lowest levels of force possible, we affirm the district court's grant of summary judgment to the Deputies for the seizure of and use of force against Celia.

### 2. Use of Force Against William

We now address the Deputies' use of force against William and conclude that the district court erred in finding it was not excessive.

### a. Nature and Quality of the Intrusion

We again begin by assessing the nature and quality of the intrusion. *See Graham*, 490 U.S. at 396. We find the intrusion on William's liberty was "simply too great" in the context of detaining a non-suspect witness. *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). According to William, the Deputies pointed a gun at him, kicked his legs apart, turned his head beyond its natural range of motion, kicked his knees to force his legs to buckle, smashed his head into the hood of the car, and tightly handcuffed him, resulting in a great deal of pain. Although the Deputies employed mitigating measures when they learned that William's shoulders were healing from surgery, the initial use of force and the harm it caused remain significant.

Even when police have reasonable suspicion to make an investigatory stop, "drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Lambert*, 98 F.3d at 1187. William's expectation of privacy as a non-suspect witness was even greater than that of an individual subject to an investigatory stop. Moreover, when viewing the facts in the light most favorable to the Bernals, the Deputies did not utilize sufficient warnings or attempt less intrusive means before resorting to harsh physical holds.

*See Rice*, 989 F.3d at 1122.  When William raised up a cell phone to record the incident, Deputy Bliss's first reaction was to draw his firearm, aim it at William, and order him to put his hands up.  When William did not immediately comply, Deputies Bliss and Chhlang proceeded to forcibly restrain William, causing him to suffer significant pain.

### b.  Severity of the Crime at Issue

We now weigh the nature and quality of the intrusion against the government's interests.  *See Graham*, 490 U.S. at 396.  We arrive at the same conclusion for William as we do for Celia on the first *Graham* factor.  As with Celia, the Deputies did not suspect William of committing a crime when they first arrived at the Bernals' home.  The Deputies assert they had probable cause to arrest William when he physically resisted their attempts to detain him.

However, "[i]t is well established under California law that even an outright refusal to cooperate with police officers cannot create adequate grounds for [police] intrusion without more." *Velazquez*, 793 F.3d at 1023.  Furthermore, for William to be properly arrested for obstruction under Section 148 of the California Penal Code, the Deputies must have been acting lawfully prior to the obstruction. *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1008 (9th Cir. 2022) (en banc) ("[T]he validity of a conviction of an offense involving a peace officer engaged in the performance of his or her duties depends on whether the officer was acting lawfully *at the time* the offense against the officer was committed." (internal quotations omitted) (citing *People v. Williams*, 236 Cal. Rptr. 3d 587, 599 (Ct. App. 2018))). Thus, if the Deputies' reasons for forcibly detaining William were predicated on his failure to obey unlawful orders, there can be no Section 148 violation.

Viewing the evidence in the light most favorable to the Bernals, we find a triable issue of fact regarding whether the Deputies' commands to William were lawful. Verbally challenging and recording officers are not illegal actions, and thus orders to cease such actions are not lawful orders. *See Duran v. City of Douglas*, 904 F.2d 1372, 1377 (9th Cir. 1990) (holding that "making obscene gestures" and "yelling profanities," while "boorish, crass and, initially at least, unjustified," is "not illegal"); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1174 (9th Cir. 2013) (stating that "[e]ven though the police may dislike being the object of abusive language," they are not permitted "to use the awesome power which they possess to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (holding that officers could not "prevent or dissuade" the plaintiff "from exercising his First Amendment right to film matters of public interest"). Therefore, when William did not comply with the Deputies' orders to put his phone down and stop yelling, he was not disobeying a lawful command. *See In re Chase C.*, 196 Cal. Rptr. 3d at 388. Accordingly, the Deputies were not acting lawfully when they restrained William, negating any probable cause they had to arrest him for resisting under Section 148. *See Lemos*, 40 F.4th at 1008.

The only remaining crime at issue was the threatened school shooting. Although William himself was not involved in this crime, the unfolding emergency of a threatened school shooting must be taken into account. *See Ames*, 846 F.3d at 349. The first *Graham* factor therefore weighs in favor of the Deputies, but only slightly.

### c.  Threat to Deputies' Safety

The second and "most important" *Graham* factor weighs in favor of William.  *Graham*, 490 U.S. at 396; *Ames*, 846 F.3d at 349.  The district court's grant of summary judgment to the Deputies was premised primarily on the Deputies' assertion that they reasonably feared for their safety.  We find the district court's grant of summary judgment on this issue improper for two reasons.  First, a genuine dispute of material fact remains as to whether William reached into an unsearched bag.  FED. R. CIV. P. 56(a); *see also Celotex Corp.*, 477 U.S. at 322–23.  Second, the undisputed facts reflect that the Deputies knew William was unarmed, undermining their claim that they feared for their safety.

The Deputies' primary argument, which the district court accepted, is that they thought William was reaching for a weapon when he put his hand into his duffel bag.  However, this cannot justify the Deputies' use of force for two distinct reasons.  First, whether William, in fact, had his hand in the bag at any point is hotly disputed.  According to the Bernals, William never reached into a bag.  Rather, he used both hands to hold his cell phone as he attempted to record the Deputies restraining Celia.  On a motion for summary judgment, courts must not weigh the evidence or assess credibility, but rather must make all reasonable inferences in favor of the non-moving party.  *See Tolan v. Cotton*, 572 U.S. 650, 655–59 (2014) (per curiam) (holding that, in determining whether a dispute about a material fact is "genuine," the trial court must not weigh the evidence and instead must draw all reasonable inference in the nonmoving party's favor).  The district court's acknowledgment and rejection of the Bernals' version of the events, however implausible the court perceived it to be, was improper.  *See Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017)

(holding that a court may not discount "self-serving" testimony that includes contrary factual assertions and requires the observation of a witness's demeanor to assess credibility).  Thus, when taking all inferences in the light most favorable to the Bernals, William held his phone, attempted to record the Deputies, and yelled at them to stop assaulting his wife.  None of these actions warrants any use of force, much less to the extent the Deputies used.

Second, even taking the Deputies' account as true, the Deputies were not entitled to forcibly restrain William because of his purportedly reaching into the duffel bag.  Our inquiry on this issue asks whether, at the time of the detention, the Deputies could reasonably have believed that William's reach into the bag posed a threat to their safety. *See Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *White v. Pauly*, 137 S. Ct. 548, 550 (2017)).  We conclude they could not.

We have held there was no reasonable threat to officer safety when an uncooperative individual put their hand in their weighted-down pocket because the officers had information that the individual was unarmed and was not suspected of committing a crime involving weapons. *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016).  In *A.K.H.*, officers responded to a domestic violence call where the victim reported that Herrera, a known member of the "Southside Gang," hit her on the head and left on foot. *Id.* at 1011–12.  When the officers encountered Herrera, he was noncompliant and put his hand in his pocket which appeared to be weighed down by something heavy. *Id.*  Fearing Herrera was armed, the officers shot and killed Herrera. *Id.*  We held this use of force unreasonable because the officers "had little, if any, reason to believe that Herrera was armed." *Id.* at 1012.

Before the officers encountered Herrera, police dispatch informed the officers that, despite being associated with a gang, Herrera "was not known to carry weapons." *Id.* We further noted that, although Herrera had a traffic warrant out for his arrest and had been convicted for drug possession, those were "relatively minor crimes, neither of which entailed violence or gun possession." *Id.*

The Deputies in this case had even less reason to believe William was armed than the officers in *A.K.H.* The Deputies conducted a weapons check prior to arriving at the Bernals' house and learned that there were no firearms registered to the home. Further, William was not a gang member, had no prior convictions, and no warrants out for his arrest. William was not suspected of committing a crime, much less a crime that entailed violence or gun possession. The Deputies responded to a call regarding the potential crime of a third person who they had substantial reason to believe was not even at the Bernals' home. Thus, William's lack of cooperation and reach into the duffel bag did not create cause to point a firearm at and aggressively restrain him.

Independent of whether William reached into the duffel bag, we find that the Deputies did not have cause to use force against William even under the undisputed facts. The uncontroverted facts in the record reflect that it was immediately apparent to everyone at the scene that William had a cell phone in his hands, not a weapon. Before Deputies Chhlang and Bliss restrained William, they stated they saw William pull out a cell phone, and not a firearm or other weapon. The third-party witness, Gary Turner, stated he saw William holding his phone, filming, and yelling at the Deputies. Turner additionally testified that he recalled the Deputies telling William to put the phone down. William even voiced his intention, loudly yelling he was "going to

record the whole thing." And yet, despite knowing the object William held posed no danger to them or others, the Deputies proceeded to use a substantial amount of force to restrain William, injuring him in the process. Based on their own admissions, the Deputies could not have reasonably believed that William, a non-suspect witness, posed such a threat to officer safety that would require the level of force the Deputies used on William. *See Tekle v. United States*, 511 F.3d 839, 860 (9th Cir. 2007) ("The proposition that police may not inflict pain on non-suspects . . . in the absence of any law enforcement reason, should be so obvious to reasonable officers that qualified immunity cannot shield them.") (Kleinfeld, J., concurring)).

The Deputies also argue that William's "belligerent" demeanor caused them to fear for their safety. It is undisputed that William yelled at the Deputies to stop touching his wife and refused to put his cell phone down. However, verbally challenging and recording officers are not illegal actions. *See Duran*, 904 F.2d at 1377 (holding that "making obscene gestures" and "yelling profanities," while "boorish, crass and, initially at least, unjustified," is "not illegal"). Furthermore, William's actions remained protected under the First Amendment "even if [they were] intended to interfere with the performance of an officer's duty, provided no physical interference occurs." *In re Chase C.*, 196 Cal. Rptr. 3d at 388; *see also Fordyce*, 55 F.3d at 439. William did not attempt to physically interfere with the Deputies as they restrained Celia. Thus, the Deputies therefore could not have reasonably used force to stop William from yelling or recording. *See Johnson*, 724 F.3d at 1174.

Furthermore, while in some cases "abrupt movements or . . . suspicious, furtive behavior" may "justifiably prompt[]"

an officer to fear for their safety, *United States v. Brown*, 996 F.3d 998, 1007–08 (9th Cir. 2021) (citation and quotation marks omitted), officers merely stating they feared for their safety "is not enough; there must be objective factors to justify such a concern," *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).  There are no such indicia here.  William did not approach the Deputies, assault them, or attempt to fight them.  *See Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 939, 948 (9th Cir. 2017) (officer's fear for their safety was reasonable where the detainee "engaged in a struggle with the deputies, physically resisting them, and . . . tossing them around").  William merely breathed heavily, widened his eyes, and was upset at seeing Deputies forcefully restrain his wife.  Moreover, as we noted previously, William was not suspected of committing any crime, much less a serious one which would give rise to an inference that he was armed.  *Cf. Nehad v. Browder*, 929 F.3d 1125, 1130–31 (9th Cir. 2019) (weighing the fact that the detainee had been reported threatening people with a knife in favor of the officers' use of force); *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016) (weighing the fact that the detainee was believed to be a member of a gang that was investigated for selling and possessing firearms in favor of the use of force).

Finally, the Deputies contend that William's large size compared to Deputies Bliss and Chhlang justified their use of force.  While disparities in size are germane to a use of force inquiry, they are most relevant when they create a change in the status quo, leading to an actual need to employ greater force.  For example, in *Isayeva*, we noted that a similar "disparity in size posed obvious risks of physical harm to the officers."  872 F.3d at 949.  There, however, the deputies detained a self-proclaimed schizophrenic who

appeared to be on drugs and was acting and speaking erratically. *Id.* at 943. When the deputies attempted to detain him, he punched one deputy in the face and threw another into the wall. *Id.* at 944.

Despite William's large stature, there are no circumstances here justifying the Deputies' escalation of force as there were in *Isayeva*. Accepting William's version of the facts, he twisted away from Deputy Chhlang to alleviate the pain he experienced when his surgically repaired arms were wrenched together. Unlike the detainee in *Isayeva*, William did not push the Deputies, punch them, or throw them off him. *See id.* at 943. In short, William's height and weight advantage over the Deputies did not create a need to restrain him and thus cannot serve as a justification for their use of force.

Accordingly, we weigh the second *Graham* factor in favor of William.

### d. Active Resistance or Attempt to Flee

To the extent William "actively resist[ed]" the Deputies' attempts to restrain him, this factor weighs only slightly in favor of the Deputies. *Graham*, 490 U.S. at 396. The Deputies first argue that William resisted the Deputies' attempts to question him. However, the record does not indicate that Deputies asked William any questions or even attempted to—they were directing their questions to Celia. The Deputies never spoke to William until he purportedly reached into his bag. William could therefore not have been resisting Deputies' attempts to question him. Moreover, as we previously discussed, William yelling at the officers does not, on its own, constitute resistance. *See Johnson*, 724 F.3d at 1174 (holding that a person cannot be arrested merely for yelling at police).

The Deputies next contend that William resisted the Deputies' efforts to restrain him.  When viewing the evidence in the light most favorable to William, we conclude this, at most, constitutes minimal resistance.  William testified he did not hit any of the officers, although he did recall struggling against the Deputies' holds to relieve the pain from his surgically repaired shoulders.  Moreover, even if William intentionally elbowed Deputy Chhlang, this resistance is not proportionate to the significant amount of force the Deputies used to restrain him.  Accordingly, we weigh this factor slightly in favor of William.

Weighing all relevant factors, we find that the district court erred in granting summary judgment to the Deputies by disregarding genuine disputes of material fact.  We additionally find that the Deputies used excessive force when they violently detained William despite knowing he was unarmed and posed no reasonable threat to officer safety.

## C.  Qualified Immunity

Having found that the Deputies violated William's Fourth Amendment rights, we consider whether the Deputies are nonetheless entitled to qualified immunity. Qualified immunity shields law enforcement officers from civil liability under § 1983 "unless the officers violated a clearly established constitutional right." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020).  We make two inquiries in determining whether qualified immunity applies: first, did the Deputies violate a constitutional right, and if so, was that right "clearly established" at the time of the misconduct? *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232–33 (2009)).

As noted, the first step in the analysis is satisfied.  Thus, we turn to the second and ask whether William's constitutional right the Deputies violated was clearly established.  "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[4]  *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)).  In the Fourth Amendment context, defining clearly established law with specificity is particularly important because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual

---

[4] The Bernals additionally argue that we should not apply qualified immunity because the doctrine is unconstitutional.  We decline to do so for two reasons.  First, the Bernals argue that qualified immunity violates the right to petition for redress of grievances in the First Amendment.  *See* U.S. CONST. amend. 1 ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances").  This is an improper basis for challenging the doctrine.  Although Congress promulgated the Civil Rights Act of 1871, including Section 1983, qualified immunity itself is a court-created doctrine.  *See Ziglar v. Abbasi*, 582 U.S. 120, 160 (2017) (Thomas, J., concurring).  Therefore, the First Amendment's requirement that "Congress shall make no law" cannot serve as a vehicle to overturn qualified immunity.

Second, consistent with the Supreme Court's guidance, we have and continue to apply qualified immunity.  *See, e.g.*, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam); *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022).  While Justice Thomas has recently expressed his view that qualified immunity is an improper judicially created doctrine, his opinion is not currently the law.  *See Ziglar*, 582 U.S. at 157–60 (Thomas, J., concurring); *Baxter v. Bracey*, 140 S. Ct. 1862, 1863 (2020) (Thomas, J., dissenting from the denial of certiorari).

situation the officer confronts." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021) (per curiam) (cleaned up). "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate." *Emmons*, 139 S. Ct. at 504 (cleaned up).    We conclude that the Deputies violated clearly established law whether we accept the Bernals' or the Deputies' account of events.

Viewing the evidence in the light most favorable to the Bernals, William never reached into his bag, and instead yelled at the Deputies to stop assaulting his wife and attempted to record the Deputies.  Recording and verbally challenging police are not only legal actions but are protected by the First Amendment.  The Supreme Court held in *Houston v. Hill* that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."  482 U.S. 451, 462 (1987).  Although not an absolute right, the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63; *see also United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001) ("Criticism of the police, profane or otherwise, is not a crime.").    Therefore, William's right to verbally challenge police is clearly established.

Similarly, we held in *Fordyce* that the First Amendment protects the right to film matters of public interest.  55 F.3d at 439.  This right is further established in California's penal code, which states that it is not obstruction to make an "audio or video recording" of an officer "while the officer is in a public place" or the person making the recording "is in a place he or she has the right to be." CAL. PEN. CODE § 148(g) (West 2014).    William was recording, or attempting to

record, police in his front yard, a place where he undoubtedly had the right to be. Accordingly, William's right to record police is clearly established and the Deputies are not entitled to qualified immunity.

Even if we take the Deputies' account of events as true, the Deputies were on notice that merely reaching into an unsearched bag, without more, could not reasonably lead to an inference that William was armed such that a use of force was justified. We held in *A.K.H.* that police used excessive force in part because there was no rational reason to believe Herrera was armed even though he put his hand into his pocket which appeared to be weighed down by something heavy. *See A.K.H.*, 837 F.3d at 1012–13. Although the police in that case used deadly force, rather than the intermediate amount of force the Deputies used against William, *A.K.H.*'s holding put the Deputies on notice that reaching into an unsearched pocket, or bag, without any other indicia that weapons may be present does not permit them to assume William was reaching for a firearm as a justification for using force. The Deputies here had even less reason to assume William was armed than those in *A.K.H.* There, the decedent was a known gang member, was reported to have assaulted his partner, had prior convictions, and had a warrant out for his arrest. *See id.* at 1012. As we previously noted, there were no similar indicia William could be armed here.

Finally, once it became apparent that William held a cell phone, and not a weapon, the officers were on notice they could not violently restrain him. William was an unarmed, non-suspect witness who posed no physical threat to the Deputies or others. "The proposition that police may not inflict pain on non-suspects . . . in the absence of any law enforcement reason, should be so obvious to reasonable

officers that qualified immunity cannot shield them." *Tekle*, 511 F.3d at 860 (Kleinfeld, J., concurring).

Thus, even accepting the Deputies' account of events, we find they violated William's clearly established right and are not entitled to qualified immunity with respect to William.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment as to Celia and reverse as to William. Because we reverse the district court's grant of summary judgment on William's Fourth Amendment claims, we reinstate William's pendent state law claims. *See Brodheim v. Cry*, 584 F.3d 1262, 1273 (9th Cir. 2009).