Filed 12/18/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re CHASE C., a Person Coming Under the Juvenile Court Law. | |
| | D067787 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J236128) |
| v. | |
| CHASE C., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County,

Browder A. Willis, III, Judge.  Reversed.

Laura R. Sheppard, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B.

Truong, Deputy Attorneys General, for Plaintiff and Respondent.

In this matter, we are asked to decide a novel issue regarding whether a minor urging his cohorts not to cooperate with a police investigation rises to the level of a violation of Penal Code[1] section 148. This case requires us to determine when a refusal to cooperate with police becomes unlawful interference with police activity under section 148. We conclude that refusal to cooperate only becomes criminal when it obstructs lawful police activity.

Appellant Chase C., a minor, was charged with resisting, delaying, or obstructing a peace officer in violation of section 148, subdivision (a)(1). On March 6, 2015, an adjudication hearing was held, at which the juvenile court found the allegation against Chase to be true. On March 27, 2015, the court adjudged Chase a ward of the court under Welfare and Institutions Code section 602 and placed him on formal probation for one year or until Chase's 18th birthday, whichever was longer.

On appeal, Chase contends that substantial evidence does not support the finding as to section 148, subdivision (a)(1). We agree and reverse the judgment.

STATEMENT OF FACTS

On May 2, 2014, at approximately 4:50 p.m., San Diego Sheriff's Deputy Scott Hill was conducting a foot patrol through Turtle Park, on Craftsman Way in the Forest Ranch area of San Diego. Hill was not in full uniform at the time, but was wearing either an external raid vest with "Sheriff" written on it, or a Sheriff shirt with patches. Hill was approached by a group of middle school children, who told him that two high school aged

---

[1] All statutory references are to the Penal Code unless otherwise specified.

2

children had tried to sell them drugs. The middle school children described the suspects with enough detail that Hill believed he would be able to find the two suspects they were describing.

*Interaction 1*

Hill set out in his patrol car and within two minutes had located two individuals who matched the suspects' descriptions "completely." The two individuals were with a group of approximately eight other minors, all of whom Hill estimated to be about 16 years old. In approaching this group, Hill parked his patrol car, got out, and specifically addressed the two individuals who matched the suspects' descriptions. Hill told the other minors that they were free to go.

Hill ordered the two suspects to sit down on the curb. One of the suspects, "Jason or Jacob McBride," cooperated right away. The second suspect, Brandon Hewgley, refused to sit down and questioned Hill about why he was being detained. At this point, one of the nonsuspect minors, Chase, began telling Hewgley "not to listen to [Hill] or obey, not to do what [Hill] was telling him to do." Hill testified that the purpose of his investigation initially was to determine whether the two suspects had been trying to sell drugs to the middle school children, and that he had no need to contact any of the other minors in the group.

As Hill was addressing the two suspects and ordering them to sit down on the curb, Hewgley continued to protest. Hewgley told Hill that he "wasn't going to listen; he wasn't going to do what [Hill] said." Hill placed his hand on Hewgley's arm and said, "Hey, I really need you to sit down." In response, Hewgley "threw his arm up as if he

3

was going to strike [Hill]." Hill grabbed Hewgley and pulled him back, holding him there while Hill requested immediate backup by radio. Hill detained Hewgley in a patrol car, and backup officers arrived on scene within two minutes. Hill then proceeded with his initial investigation by speaking with the other suspect, McBride, who had been cooperating the entire time.

In regards to what Chase said to Hewgley during Hill's initial contact, Hill testified that he could only remember "a generalized statement [by Chase] . . . telling [Hewgley] not to listen to what I was saying," and "[Chase] telling the other kids 'fuck him,' referring to me." Hill also testified that Hewgley was already refusing to comply *before* Chase told Hewgley that he should not cooperate. In contrast, Hill testified that McBride did not resist him at any time, in spite of Chase's audible protests. Hewgley remained noncompliant throughout the contact and Hill could not say whether or not this was due to Chase's verbal protestations. "I cannot say what the determining factor for [Hewgley] to remain noncompliant was."

In addition, the other nonsuspect minors were also "questioning" Hill's actions during his initial contact with Hewgley and McBride, but Hill "would not quantify their statements as interfering." While Hill testified he believed Chase's statements affected the nonsuspect minors, Hill conceded that "nobody became violent . . . nobody else became resistant physically."

*Interaction 2*

When backup deputies Baquiran and Robins arrived, Hill was placing a handcuffed Hewgley in a patrol car, while "another kid was yelling something," and the

4

other nonsuspect minors "were just kind of standing around." Baquiran detained and handcuffed all of the remaining minors, "for their safety and [the officers'] safety." Baquiran testified that the purpose of detaining the nonsuspect minors who remained on the scene was "to get their information and to make sure that they didn't have any contraband on their person and they were not involved in any type of drug sales activity." While the officers were detaining the nonsuspect minors, Chase continued to protest, telling the other minors, "Don't listen to him. This is bullshit. Don't tell him anything. Don't say shit." Baquiran asked Chase, "Please be quiet. We're trying to get information on everybody here." Chase continued to say, "Don't tell him shit."

Handcuffing and identifying the teenagers took "a few minutes," and was accomplished "in an efficient manner." Baquiran testified that there was "a little delay" in getting the minors' information, and Baquiran felt this delay was caused by Chase telling the other minors not to cooperate. The minors were initially not cooperating in providing their names, but began cooperating after Baquiran threatened that they would be taken down to the station and their parents would be called if they did not identify themselves.

Toward the end of the encounter, Hewgley began banging his head inside of the patrol car. Baquiran became concerned and "wanted to get [Hewgley] out of the area and back to the station so he [didn't] hurt himself or he [didn't] try to damage the patrol vehicle." Baquiran felt that he was delayed in dealing with Hewgley because of the need to detain the other minors and get their information.

5

*Interaction 3*

Chase refused to give his name or his parents' information on scene, stating that he was pleading the Fifth Amendment.  Baquiran testified that when he placed handcuffs on Chase, Chase said, "What the fuck," and "Am I getting arrested?"  When Baquiran told Chase that he was in fact being arrested, Chase responded, "For what?  This is bullshit."  Baquiran told Chase that he needed Chase to "calm down," at which point Chase yelled to the other minors, "Don't cooperate.  Don't tell them shit."  Chase did not at any time, however, physically resist Baquiran, run away, or require any use of force.  Nor did Chase physically resist or obstruct Hill in his performance of his duties.  Finally, once Chase was arrested and placed in the patrol car, Baquiran testified that Chase became "extremely" cooperative and remained so while at the station.  None of the other minors were arrested aside from Chase and Hewgley.

At the adjudication hearing, Baquiran was asked what the main reason for placing Chase under arrest was.  He answered:

> "He delayed what we were trying to do, trying to accomplish by him not providing -- just simple information:  what is your name, who can we contact so they can come and take care of you, take custody of you here.  That's all we needed to do.  It's very simple.  Just, what is your name?  Who is your mom?  Where is your dad?  What's your phone number?  But they refused to provide that information to us."

The People asked Baquiran if there were any other factors that led him to place Chase under arrest at that time.  Baquiran responded:

> "Yeah.  One was when I first had contact with him, he was telling the other kids, 'Don't tell them shit.  Don't tell them anything.'  Pretty much, 'Don't cooperate.'  And it makes our job harder if one person is telling the whole group don't cooperate with the cops; don't listen

6

to them; they are not going to do anything; don't listen to them; they can't do anything to us, pretty much. He didn't say that, but that's what he's telling them: Don't tell them nothing and they got nothing."

The juvenile court found the allegation against Chase to be true. The court adjudged Chase a ward of the court under Welfare and Institutions Code section 602 and placed him on formal probation for one year or until Chase's 18th birthday, whichever was longer.

## STANDARD OF REVIEW

Our review is governed by the same principles applicable to adult criminal appeals. (*In re Roderick P.* (1972) 7 Cal.3d 801, 809.) Our function is "to determine whether the record contains any substantial evidence tending to support the finding of the trier of fact, and in considering this question we must view this evidence in the light most favorable to the finding." (*Id.* at p. 808.) Substantial evidence is evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the appellant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The test is not whether guilt is established beyond a reasonable doubt, but whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

DISCUSSION

I

*SECTION 148*

The elements of a violation of section 148, subdivision (a)(1) are the following: " ' "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." ' " (*Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894-895.) However, "it is no crime in this state to nonviolently resist the unlawful action of police officers." (*In re Michael V.* (1974) 10 Cal.3d 676, 681.) Thus, "[b]efore a person can be convicted of [a violation of section 148, subdivision (a)] there must be proof beyond a reasonable doubt that the officer was acting lawfully at the time the offense against him was committed." (*In re Joseph F.* (2000) 85 Cal.App.4th 975, 982.) " 'The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in "duties" for purposes of an offense defined in such terms, if the officer's conduct is unlawful . . . .' " (*In re Manuel G.* (1997) 16 Cal.4th 805, 815; *People v. Cruz* (2008) 44 Cal.4th 636, 673 ["it is also a 'well-established rule that when a statute makes it a crime to commit any act against a peace officer engaged in the performance of his or her duties, part of the corpus delicti of the offense is that the officer was acting lawfully at the time the offense was committed' "].) "Under California law, an officer is not lawfully performing her duties when she *detains an individual*

8

*without reasonable suspicion* or arrests an individual without probable cause." (*Nuno v. County of San Bernardino* (C.D.Cal. 1999) 58 F.Supp.2d 1127, 1134, italics added.)

II

*THE CONVICTION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE*

Chase contends substantial evidence does not support the judgment as to the resisting charge because his verbal conduct in telling the other minors not to cooperate was protected political speech, which did not result in any physical interference with the officer's investigation. Furthermore, the nonsuspect minors were not being lawfully detained and therefore it was within Chase's rights to tell them not to provide their information, and to decline to provide his own information.

In analyzing the charge of resisting a peace officer, we see distinct constitutional and statutory issues with respect to Chase's conduct (1) in telling Hewgley not to cooperate, (2) in telling the nonsuspect minors not to cooperate, and (3) in refusing to disclose his identity to police prior to being placed in a patrol car.

A. Chase's Conduct in Telling Hewgley Not to Cooperate (Interaction 1)

Analyzing Chase's conviction under section 148 for his prearrest actions at Interaction 1, where Chase encouraged Hewgley not to cooperate with Deputy Hill, the evidence was insufficient to show that Chase's conduct had any effect on the arrest or processing of Hewgley. Chase's verbal criticism of Hewgley's detention did not violate section 148 because it was protected political speech. "Speech is generally protected by the First Amendment, even if it is intended to interfere with the performance of an officer's duty, provided no physical interference results." (*Long v. Valentino* (1989) 216

9

Cal.App.3d 1287, 1296.) Chase was merely exercising his right to *verbally* protest and challenge law enforcement's decision to detain his friend. No physical interference resulted. Therefore, this conduct does not rise to the level of a section 148 violation.

Furthermore, Hewgley demonstrated his unwillingness to comply with Hill's orders *before* Chase began protesting, and continued it long after he was separated from Chase by being placed in the patrol car. Hewgley went so far as to physically resist by raising his arm up against Hill. No evidence was presented that Hewgley engaged in these actions as a result of Chase's words. In fact, Hill testified he could not say whether Chase's words influenced Hewgley at all. Because Hewgley was resisting *prior* to Chase's comments, and continued resisting long after the two were separated, there is no evidence in the record that Chase obstructed or delayed Hill's arrest of Hewgley.

B.  Chase's Conduct in Telling Nonsuspect Minors Not to Cooperate (Interaction 2)

Interaction 2 consisted of Chase encouraging the nonsuspect minors not to provide their information to officers. The evidence was insufficient to show a violation of section 148 based upon this act because the officers were not engaged in the lawful performance of their duties. (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1109.)

The lawfulness of the officer's conduct is an *essential element* of the offense of resisting, delaying, or obstructing a peace officer. (*In re Joseph F.* (2000) 85 Cal.App.4th 975, 982.)

In this case, there was no lawful detention or arrest of the admittedly nonsuspect minors. Hill testified that the tip he received described only McBride and Hewgley. When Hill encountered the suspects with the large group of minors, he told the

10

nonsuspect minors (including Chase) they were free to go. Instead of leaving the scene, the minors "chose to stay" and protest Hill's decision to detain McBride and Hewgley. However, the fact that the minors chose to stay after they were told they were free to go did not make them subject to detention.

In fact, the minors did nothing to create a reason to detain them. Nor was any evidence offered suggesting any other crime that the minors were suspected of, which might have provided a lawful reason to detain the minors under the Fourth Amendment. (*Terry v. Ohio* (1968) 392 U.S. 1, 21.) The detention of the minors was unlawful. As such, Chase's conduct in protesting their detention was not only politically protected free speech,[2] but would never rise to the level of a section 148 violation for want of an essential element of the crime. (*In re Joseph F.*, *supra,* 85 Cal.App.4th at p. 982.)

C. Chase's Refusal to Give His Information (Interaction 3)

Chase relies upon *People v. Quiroga* (1993) 16 Cal.App.4th 961 (*Quiroga*) to show that his conduct amounted to nothing more than verbal resistance and his actions were protected by the First Amendment. The court in *Quiroga* held that an individual who protested repeatedly before complying with an officer's orders could not be prosecuted under section 148 because verbal challenges to police action are protected by the First Amendment. (*Id.* at p. 966.) Although the defendant in *Quiroga* did not

_____

[2]     While an individual's critical comments may be provocative and challenging, they are "nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." (*Terminiello v. City of Chicago* (1949) 337 U.S. 1, 4.)

11

"respond with alacrity" to an officer's orders, he did ultimately respond to them. (*Id.* at p. 964 ["Appellant argued before *complying with the order.*"; italics added].) Chase's conduct is similar.

Interaction 3 consisted of Chase refusing to provide officers with his identification and encouraging the nonsuspect minors not to provide their information as well. The evidence was insufficient to show a violation of section 148 based upon this act because the conduct, if it caused any delay, caused a *lawful* delay which did not violate section 148.

Chase was detained along with the other nonsuspect minors when deputies Baquiran and Robbins arrived on scene. Baquiran testified that his reason for arresting Chase, who was admittedly not the target of the initial investigation, was Chase's refusal to provide his information and his instructing the other minors not to cooperate. At this point, Chase's conduct did not violate section 148 because it did not delay or obstruct a peace officer in the discharge of any duty within the meaning of the statute. Chase's arrest had already been effected. Chase's noncooperation did not serve to delay or thwart his detention, as he was already detained. And it was still premature to ask the questions needed for booking Chase in jail. (*Quiroga, supra,* 16 Cal.App.4th at p. 966.)

Under California law, the fact that someone verbally challenges a police officer's authority or is slow to comply with orders does not mean that he or she has delayed an investigation. (*Quiroga, supra,* 16 Cal.App.4th at p. 966.) In *Quiroga*, police officers entered an apartment after observing, through the open front door, one of the occupants holding what appeared to be a marijuana cigarette. (*Id.* at p. 964.) As the officers

12

entered, the defendant stood up from a couch and began to walk into the hallway. One of the officers ordered the defendant to sit back down. The defendant "argued before complying with the order." (*Ibid.*) Moments later, the officer, noticing that the defendant was reaching with his right hand between the couch cushions and the side of the couch, ordered the defendant to put his hands on his lap. "Again [the defendant] was 'very uncooperative' but 'finally' obeyed the order." (*Ibid.*) Shortly thereafter, the officer ordered the defendant to stand up. The defendant "refus[ed] several times" before he finally complied. (*Ibid.*) Shortly after that, the officer found a quantity of cocaine under a couch cushion where he had seen the defendant reaching, and placed the defendant under arrest. (*Id.* at p. 965.)

The appellate court stated, "We find nothing in appellant's conduct *before*[3] his arrest that might justify a charge of violating Penal Code section 148. It is true that [defendant] complied slowly with [the police officer's] orders, but it surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders." (*Quiroga, supra,* 16 Cal.App.4th at p. 966.)

However, when a person's words go "beyond verbal criticism, into the realm of interference with [an officer's performance of his or her] duty," the First Amendment does not preclude criminal punishment. (*People v. Lacefield* (2007) 157 Cal.App.4th

---

3      Like in the present case, there were distinct constitutional and statutory issues with respect to defendant's conduct prearrest and postarrest. The court in *Quiroga* held that defendant's prearrest conduct in verbally protesting police action did not violate section 148, where his postarrest conduct of refusing to identify himself *at the booking stage* of arrest did violate section 148. (*Quiroga, supra,* 16 Cal.App.4th at p. 972.)

249, 261.) For example, the defendant in *In re Joe R.* (1970) 12 Cal.App.3d 80, 83-84, interrupted a police officer as he was talking with minors who were out after curfew, and persisted in talking and interrupting after the officer asked him not to do so, making it impossible for the officer to elicit the information he sought. The officer approached the defendant, who pushed him. The officer then took hold of the defendant's arm; the defendant used profane language, broke away from the officer, and hit another officer who was trying to stop him before running away. The defendant in *People v. Green* (1997) 51 Cal.App.4th 1433, 1436, 1438, went beyond the speech protected by the First Amendment when he tried to intimidate a suspected victim of child abuse into denying the commission of the offense. The defendant in *People v. Christopher* (2006) 137 Cal.App.4th 418, 423, gave a false name to police officers who had taken him into custody. The court distinguished refusing to give one's name before the booking stage of arrest, which is not a violation of section 148, from giving a false name, which *is* punishable under section 148 because it causes a delay beyond that protected by the Fifth Amendment. (*Christopher, supra,* at p. 428.)

In *In re Muhammed C.* (2002) 95 Cal.App.4th 1325, police officers arrested a juvenile's associate on drug charges and placed him in the back of a patrol car. (*Id.* at p. 1328.) The back window of the patrol car was partially down, and the juvenile "approached the back of the patrol car and spoke to [his associate]." (*Ibid.*) One of the officers ordered the defendant to move away, and then another officer did as well. At that point, the defendant raised his hand toward the officers. The officers then ordered him to get away from the car again. Finally, they arrested him. (*Ibid.*) The appellate

14

court affirmed the conviction because "a reasonable inference could be drawn that appellant willfully delayed the officers' performance of duties by refusing the officers' repeated requests that he step away from the patrol car." (*Id.* at p. 1330.) The court reasoned that the defendant in *Muhammed* "acknowledged the officers' orders with his hand gesture yet continued his conversation with [the suspect]. Thus, there is no mere failure to respond here. [The defendant] affirmatively responded to the police orders with defiance." (*Ibid.*) In each of these cases, the defendant engaged in conduct beyond merely responding slowly and challenging officers' authority.

Here, there is no evidence that Chase used physical force, impeded an investigation, or lied to the officers. Unlike the defendant in *In re Muhammed, supra*, 95 Cal.App.4th 1325, Chase was not inserting himself into an investigation that did not involve him because he was a member of the group that was stopped by law enforcement. This situation is much more like *Quiroga*, where the defendant himself was not the initial target of the investigation, but was merely a companion of the suspect and was present when officers began investigating. (*Quiroga, supra,* 16 Cal.App.4th at p. 964.) Like Chase, the defendant in *Quiroga* was free to leave the scene, but chose to stay and protest police action. (*Ibid.*) Like Chase's Fourth Amendment challenge to the detention of his friends, the defendant in *Quiroga* challenged officers' right to enter the home without a warrant and, like Chase, delayed the officers' investigation by refusing to stay quiet. (*Ibid.*) Although the defendant's approach in *Quiroga* was "uncooperative," his actions were found to be protected by the First Amendment. (*Id.* at p. 966.)

15

Like the defendant in *Quiroga,* Chase did not initially comply with the officer's order that he be quiet, refusing to cooperate until he was placed in handcuffs. Chase argued with the officers and asserted what he took to be his rights much like the defendant in *Quiroga.* We agree with the court in *Quiroga* that section 148 does not "criminalize[ ] a person's failure to respond with alacrity to police orders" and that the First Amendment protects the right to dispute an officer's actions. (*Quiroga, supra,* 16 Cal.App.4th at p. 966.) Chase's conduct constituted a simple delay in responding to a directive from a police officer while engaging in protected speech. Viewed in the light most favorable to the judgment, Chase did little more than curse, verbally protest, and delay providing identification. We conclude under the specific circumstances of this case, such conduct does not violate section 148, subdivision (a)(1).

Furthermore, Chase eventually complied with the deputies' requests for identification. Chase's eventual cooperation en route to the station is dispositive. While the act of refusing to disclose one's identity at the booking stage of arrest "unquestionably" obstructs a police officer in the discharge of his or her duties, a mere "refusal to disclose personal information following arrest for a misdemeanor or infraction cannot constitute a violation of Penal Code section 148." (*Quiroga, supra,* 16 Cal.App.4th at p. 970.) This is because the routine booking interview is "an indispensable procedure in the efficient administration of justice." (*Id.* at p. 971; see § 7, subd. 21; *People v. Rucker* (1980) 26 Cal.3d 368, 392 (conc. & dis. opn. of Richardson, J.) ["The regular and routine processing of individuals who have been arrested for suspected criminal conduct necessitates that the police obtain information to confirm the

16

identity of the suspect, to provide for medical care if such is required, to identify next of kin in the event of an emergency, and to accomplish various other valid police functions directly related to booking."].) However, preceding a booking interview, the Fifth Amendment renders a suspect "free to refuse to identify himself or to answer questions" without violating section 148. (*Quiroga, supra,* 16 Cal.App.4th at pp. 967-969.)

Analyzing Chase's conviction under section 148 for his postarrest actions during Interaction 3, Chase's conduct in refusing to identify himself is distinguishable from the defendant's conduct in *Quiroga*. In *Quiroga*, the police arrested the defendant for possession of cocaine following a search of his home. (*Quiroga, supra,* 16 Cal.App.4th at pp. 964-965.) After his arrest, the defendant refused to give his name although a police officer repeatedly asked him for identification both in the patrol car while he was being transported to the police station and while at the police station. Upon his arrival at the jail, the defendant persisted in refusing to give his name during the booking process. After about 30 minutes, one of the correctional officers recognized the defendant and provided his identity. (*Id.* at p. 965.)

On appeal, the defendant in *Quiroga* maintained there was no evidence to support his conviction of resisting a peace officer in violation of section 148, subdivision (a). (*Quiroga, supra,* 16 Cal.App.4th at p. 965.) The Court of Appeal rejected that contention and affirmed his conviction under subdivision (a), holding that although the defendant's refusal to give his name en route to the jail did not violate section 148, subdivision (a), his "act of refusing to disclose his identity" during the booking interview at the jail

17

"unquestionably served to resist, delay and obstruct the responsible peace officer in the discharge of his duties" and did violate that section. (*Quiroga, supra,* at p. 972.)

Here, Chase's refusal to identify himself, not just preceding booking but before even being placed in a patrol car, was protected conduct under the Fifth Amendment. Only if Chase had refused to provide his identity at the booking stage, or had provided false identifying information, would his conduct violate section 148. (*Quiroga, supra,* 16 Cal.App.4th at p. 966; *People v. Christopher, supra,* 137 Cal.App.4th 418, 428.) Although Chase's refusal to identify himself while detained undoubtedly slowed down the officers' investigation, this delay was a lawful exercise of Chase's Fifth Amendment rights and cannot violate section 148.

## CONCLUSION

Viewing the evidence most favorably to the judgment, Chase did not willfully resist Baquiran or Hill, knowing these two deputies to be peace officers engaged in the performance of their duties. Chase's verbal protests against the detention of his friends, prearrest, were protected political speech under the First Amendment. Chase's prearrest conduct in telling the nonsuspect minors not to cooperate amounted to nothing more than lawful protest against unlawful detention. And finally, Chase's refusal to identify himself postarrest, but before being transported to the station, was lawful silence under the Fifth Amendment.

18

DISPOSITION

The judgment is reversed.

HUFFMAN, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.

19