Filed 2/20/25  P. v. Garcia CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAFAEL GARCIA, JR.,<br><br>    Defendant and Appellant. | A169637<br><br>(Lake County Super. Ct. No. CR968167A.) |

Defendant Rafael Garcia, Jr. appeals his convictions for possessing and transporting myriad controlled substances and ammunition for lack of sufficient evidence and because the trial court's admission of defendant's prior drug convictions was unduly prejudicial.  Garcia also contends that his misdemeanor conviction for willfully delaying a police officer in the performance of his duties should be reversed for insufficient evidence.  We agree with his final argument and therefore reverse the judgment with respect to the misdemeanor conviction under Penal Code section 148, subdivision (a)(1).[1]  We affirm the judgment in all other respects.

_____

[1] All further statutory references are to the Penal Code unless otherwise stated.

1

# BACKGROUND

## A. Arrest and Charges

Officer Chris Kelleher of the Clear Lake Police Department observed Garcia commit a purported traffic violation, and, following a subsequent search, found illicit contraband in the vehicle. The Lake County District Attorney charged Garcia with nine felonies and two misdemeanors and alleged six circumstances in aggravation. The criminal charges were: possessing and transporting heroin (Health & Saf. Code, §§ 11351, 11352, subd. (a); counts 1 and 2); possessing and transporting cocaine (Health & Saf. Code, §§ 11351, 11352, subd. (a); counts 3 and 4); possessing and transporting methamphetamine (Health & Saf. Code, §§ 11378, 11379, subd. (a); counts 5 and 6); possessing and transporting psilocybin mushrooms (Health & Saf. Code, §§ 11378, 11379, subd. (a); counts 7 and 8); possessing ammunition as a felon (§ 30305, subd. (a)(1); count 9); misdemeanor driving with a suspended driving privilege (Veh. Code, § 14601.2, subd. (a); count 10); and misdemeanor willfully delaying, obstructing, or resisting a peace officer (§ 148, subd. (a)(1); count 11.)

Garcia pled not guilty and denied the allegations, and the matter was set for jury trial. After the jury had been sworn in, Garcia pleaded guilty to count 10, removing it from the jury's consideration.

## B. Prosecution Case

The prosecution's case-in-chief centered on Kelleher's testimony and body cam footage. On the morning of Garcia's arrest, Kelleher was driving a marked police vehicle when he observed a green SUV with out-of-state plates stopped in the middle of the road. Kelleher noticed that the driver, Garcia, was not wearing a seatbelt. Garcia then drove off.

2

Kelleher attempted to make a U-turn to conduct a traffic enforcement stop, but traffic impeded his turnaround.  Kelleher therefore did not activate the emergency lights on his vehicle or otherwise cause Garcia to pull over.  But Garcia parked in front of a residence's driveway not far away, allowing Kelleher to quickly catch up.  By the time Kelleher arrived, Garcia was walking "at a fast pace up the driveway towards a trailer."

Kelleher exited his vehicle and followed Garcia up the driveway.  Kelleher testified that he first issued a command to "come over" when he "got closer to [Garcia]" as he followed Garcia up the driveway by foot.  Kelleher further testified that Garcia "kept refusing to walk towards me" and that "[t]his transpired for several minutes" before "eventually he walked over towards me."

The prosecution played bodycam footage of the encounter—without audio[2]—while Kelleher provided commentary for the jury.  As the video played, Kelleher reiterated that "for several minutes [Garcia] was being defiant" and kept arguing "he wasn't doing anything wrong."

The video shows Kelleher exiting his vehicle and walking towards the driveway; about ten seconds later Garcia appears in the frame, peering back at Kelleher.  As Kelleher approached, Garcia stopped and then half-leaned, half-sat on a ladder at the end of the driveway.  Approximately 38 seconds transpired between the time Kelleher exited his vehicle and when he reached Garcia.  Over the next 7 seconds, Garcia argued with Kelleher, fanning open his palms and presenting what he was eating, before standing up.  Together, they walked back down the driveway, Garcia visibly upset.  At the end of the driveway, Garcia stepped to the side and protested

---

[2] For this reason, we do not consider the video recording's audio.

further—for nearly 30 seconds—before proceeding the last few feet to the front of the SUV.

Kelleher testified that, throughout the encounter, Garcia questioned why Kelleher was accosting him and denied that he had failed to wear a seatbelt. But, in Kelleher's view, Garcia was not "combative," nor did he threaten Kelleher. Also, by Kelleher's own admission, Garcia was "[c]ooperating" by the time he returned to the SUV.

Garcia consented to be searched, and Kelleher found $5,389 in cash but nothing illegal. Kelleher then arrested Garcia for "outstanding warrants," although that basis for the arrest was not disclosed to the jury. Kelleher told the SUV's passenger, Janel Jeffries, to exit the vehicle. Kelleher found nothing "unusual" or illegal on her person or in her purse.

Kelleher then searched the SUV. It was not registered to either Jeffries or Garcia. And Kelleher found no "indicia" of Jeffries in the SUV, but Kelleher did find Garcia's driver's license between the center console and the driver's seat.

In the SUV's back seat, "accessible by Mr. Garcia and Janel Jeffries," was a red backpack and several grocery bags. Inside the red backpack was a black bag that contained toiletries, including shampoo, moisturizing cream, and shaving cream. At the bottom of the red backpack was a clear container, which held "several separate bags" containing what Kelleher recognized, based on his training and experience, as controlled substances. "Also in the red backpack, there was a smaller clear container, and it contained 24 live rounds of .22 caliber ammunition and . . . two spent shell casings of .22 caliber ammo." In the grocery bags, Kelleher found an operable digital scale, three cell phones, and a notebook. The notebook appeared to Kelleher to be a ledger for drug transactions because it had

4

entries of "people's names, numbers consistent with amounts, and then nicknames for drugs."

Based on this cumulative evidence, Kelleher believed the suspected controlled substances were intended for sale. Kelleher testified he was aware that testing later determined the seized substances to be: 122 grams of methamphetamine; 23 grams of methamphetamine; 10 grams of methamphetamine; 8 grams of methamphetamine; 1 gram of methamphetamine; 32 grams of cocaine; 72 grams of heroin; 4 grams of heroin; 30 grams of fentanyl; 22 grams of mushrooms; 53 grams of mushrooms; 7 grams of marijuana; and two bottles containing various pills.

### C. Defense Case

At the close of the prosecution's case, the parties stipulated that Kelleher's searches of Garcia and the SUV were lawful, that Jeffries was charged as a codefendant with a trial pending, and that, if called, a qualified expert would testify to the lab results identifying and quantifying the controlled substances.

Garcia then filed a motion for acquittal under section 1118.1. The court denied the motion.

Garcia testified on his own behalf. He stated that before Kelleher saw him in the SUV, Jeffries and her boyfriend had asked Garcia to "check out her truck," meaning the SUV. Garcia agreed, telling the couple he would pick up a tool that could "scan" the vehicle's "codes." The boyfriend parked the SUV "in the middle of the street" and went into a house; Garcia got in the driver's seat and Jeffries took the passenger seat, bringing the red backpack and grocery bags with her. Garcia recalled driving past Kelleher; then he stopped at a friend's house to retrieve his tools. Thus, according to Garcia, nothing in the SUV was his.

Garcia denied any other connection to the SUV, positing that Kelleher likely found his driver's license in the SUV because it fell out of his pocket. He also denied that any of the items found in the SUV were his and claimed his preferences were inconsistent with those items. For example, Garcia averred that he was "a macho type guy" who would not own a red backpack. He stated that he does not use moisturizer or shaving cream and that he was not using shampoo at the time of his arrest because he does not "usually have hair" or only "real short hair." He further attested that the shopping bag in which the notebook was found was "consistent with what [Jeffries] was carrying when she got into the car," and that the notebook's handwriting did not match his own. Garcia asserted that the ammunition found in the red backpack was not his and that he has never owned a gun. Garcia also testified that he carried all his cash savings because he does not trust banks.

**D. Conviction and Sentence**

The jury convicted Garcia of all counts. The trial court sentenced Garcia to eight years in state prison.

## DISCUSSION

Garcia contends the evidence was insufficient to prove beyond a reasonable doubt that he was the possessor and transporter of the illicit drugs or ammunition in the SUV. He further contends the evidence was insufficient to prove beyond a reasonable doubt the section 148 offense for willfully delaying Kelleher's attempted performance of his duties. Separately, Garcia argues the trial court abused its discretion in admitting evidence of Garcia's four drug offenses. We agree the evidence was insufficient to convict Garcia of the section 148 offense. We affirm in all other respects.

## 1. Sufficiency of the Evidence

To determine whether sufficient evidence supports a jury verdict, "we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.) We draw all reasonable inferences in favor of the verdict and presume the existence of every fact a jury could reasonably deduce from the evidence. (*Ibid.*) Thus, on appeal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, superseded by 28 U.S.C. § 2254(d) on other grounds.) We apply the standard of review to determine whether the evidence was sufficient to support the denial of a section 1118.1 motion, testing the sufficiency of the evidence as it stood at the close of the prosecution's case-in-chief. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212–1213.)

### a. Substantial Evidence Supports Convictions for Possession and Transportation of Controlled Substances and Possession of Ammunition as a Felon

Garcia argues that no rational trier of fact could have found that he "possessed" the illicit goods found in the SUV he was driving. We are unpersuaded.

"The essential elements of possession of a controlled substance are 'dominion and control of the substance in a quantity usable for consumption or sale, with knowledge of its presence and of its restricted dangerous drug character. Each of these elements may be established circumstantially.' " (*People v. Palaschak* (1995) 9 Cal.4th 1236, 1242.) Possession for sale or

7

transportation of a controlled substance may be "based upon either actual or constructive possession of the substance." (*People v. Morante* (1999) 20 Cal.4th 403, 417; see *People v. Williams* (2009) 170 Cal.App.4th 587, 624–625 (*Williams*) [possession of weapons, ammunition, or drugs may be physical or constructive].)

Actual or constructive possession merely requires "the right to exercise dominion and control over the place where [contraband] is found." (*People v. Rushing* (1989) 209 Cal.App.3d 618, 622 (*Rushing*).) "Exclusive possession is not necessary. A defendant does not avoid conviction if his right to exercise dominion and control over the place where the contraband was located is shared with others." (*Ibid.*; see *People v. Morante*, *supra*, 20 Cal.4th at p. 417 ["Constructive possession exists where a defendant maintains some control or right to control contraband that is in the actual possession of another"].) Accordingly, "Possession may be imputed when the contraband is found in a location which is immediately and exclusively accessible to the accused and subject to his dominion and control." (*People v. Showers* (1968) 68 Cal.2d 639, 644.)

Garcia does not dispute that contraband was present in the SUV he was driving. He admits the red backpack and grocery bags that carried the contraband, as well as the notebook, digital scale, and multiple cellphones, were within his reach from the driver's seat. Garcia also admits that his "ID was tucked in between the driver's seat and the center console." This is substantial—even if circumstantial—evidence of Garcia's right to dominion and control over the vehicle and its contents. (*People v. Rushing*, *supra*, 209 Cal.App.3d at p. 622.)

It matters not whether Garcia owned the SUV or whether any forensic evidence, handwriting analysis, or other investigation connected Garcia to

the drugs, notebook, or cellphones.  Indeed, Garcia fails to cite any authority for the proposition that constructive possession requires forensic evidence or proof of ownership over the premises where the contraband is found.

*Rushing* is instructive.  There, police conducted a lawful search of an apartment, discovering defendant asleep in one bedroom and cocaine hidden in another.  (*Rushing*, *supra*, 209 Cal.App.3d at p. 620.)  "It was never determined in whose name the apartment was rented," and officers seized "documents containing the names of other persons, some of whom were present in the apartment."  (*Id.* at p. 620, fn. 1, 621.)  But in the same room as the defendant, officers also found papers believed to be a "a ledger for recording narcotics sales"; in both bedrooms, officers found court documents with the defendant's name.  (*Id.* at p. 620.)  The court affirmed his conviction, explaining:  "The fact Rushing had access to private areas of the apartment and left important personal papers in these locations is sufficient evidence for the jury to reasonably infer that Rushing had the right to exercise dominion and control over the apartment where the cocaine was found."  (*Id.* at p. 622.)

This reasoning has equal force here.  Garcia controlled the SUV as its driver; he left his identification card in the SUV; and he could access the contraband from where he sat.  Moreover, Garcia possessed significant cash at the time of his arrest, and the SUV contained indicia of narcotics sales— i.e., the ostensible ledger, the digital scale, and multiple cellphones.  This evidence was sufficient for the jury to reasonably infer that Garcia had the right to exercise dominion and control over the SUV, and, because it was presented during the prosecution's case-in-chief, the evidence was sufficient to support the denial of a section 1118.1 motion.

9

The defense case did not negate this evidence. The jury was free to reject Garcia's testimony as well as circumstantial evidence that some of the personal care and clothing items in the SUV did not match Garcia's tastes or needs. In sum, Garcia failed to demonstrate "that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

### b. Insufficient Evidence Supports Conviction for Violating Section 148

Garcia argues the video evidence contradicts Kelleher's testimony and disproves that he "willfully delayed Detective Kelleher in the performance or attempted performance of his duties as a peace officer." The elements to prove a section 148, subdivision (a)(1), violation are: " ' "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." ' " (*Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894–895.)

Our inquiry is narrow. Garcia does not contest the second and third elements, and Kelleher testified that Garcia's conduct did not fall within the resistance or obstruction prongs of the first element, "just delaying." Moreover, the trial court described the offense to the jury as "delaying a peace officer" and instructed the jury that "the People must prove . . . the defendant willfully delayed Detective Kelleher in the performance or attempted performance of [his] duties." The issue is therefore whether the statute's delay prong criminalizes Garcia's conduct. We conclude it does not.

"Under California law, the fact that someone verbally challenges a police officer's authority or is slow to comply with orders does not mean that he or she has delayed an investigation." (*In re Chase C.* (2015)

10

243 Cal.App.4th 107, 117 (*Chase C.*), citing *People v. Quiroga* (1993) 16 Cal.App.4th 961, 966 (*Quiroga*).) In analyzing the charge of resisting, obstructing, or delaying a peace officer, courts generally distinguish prearrest conduct from postarrest conduct. (See *Quiroga*, at p. 966; *Chase C.*, at p. 117, fn. 3.) We also must keep in mind " '[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.' " (*Quiroga*, at p. 966.) Accordingly, we inquire whether a person's conduct in fact delayed law enforcement "within the meaning of the statute." (*Ibid.*; see *Chase C.*, at p. 116.)

Here, the relevant conduct was prior to Garcia's arrest and mostly, if not entirely, verbal. Not only was Garcia not under arrest when the purported delay occurred, but Kelleher had not pulled Garcia over and he only began to issue orders pursuant to an investigatory stop when Garcia was some distance away with his back turned. Indeed, Kelleher testified that his first command to Garcia was not until he "got closer to [Garcia]" up the driveway; Garcia did stop and turn around, and it took Kelleher less than 40 seconds to reach him. While Garcia did not comply with Kelleher's orders quickly, the video reveals that Garcia stood up and began walking back down the driveway within 10 seconds of Kelleher reaching him. On cross examination, Kelleher admitted Garcia was "not combative," and Kelleher answered "no" when asked if Garcia threatened him "at any time during [his] contact with Mr. Garcia." Moreover, when asked if Garcia "ever resist[ed] or ma[d]e any passive resistance physically," Kelleher again answered "no." Indeed, after Garcia "eventually" reached the front of the vehicle, Kelleher acknowledged he was able to write down Garcia's name

11

and run it through dispatch because Garcia was "[c]ooperating" by that point.

Such "defiant" prearrest conduct — especially where the officer concedes the defendant did not put up "passive resistance physically"—does not rise to the level of a section 148 violation. (See *Chase C.*, *supra*, 243 Cal.App.4th at p. 115 [" '[S]peech is generally protected by the First Amendment, even if it is intended to interfere with the performance of an officer's duty, provided no physical interference results' "]; cf. *Quiroga*, *supra*, 16 Cal.App.4th at pp. 967–968 ["In most cases, section 148 has been applied to physical acts" and "[s]everal cases, however, have involved a combination of verbal and physical interference," but "section 148 is not limited to nonverbal conduct"].) Moreover, the investigation continued apace with Kelleher performing a consensual search of Garcia, arresting Garica without any resistance, searching the SUV, and finally arresting Jeffries. Even viewing the evidence most favorably to the judgment, Garcia did not delay Kelleher's investigation within the meaning of the statute. (*Quiroga*, at p. 966.)

*Quiroga* is instructive. There, police officers entered an apartment after observing what appeared to be a controlled substance though an open door. (*Quiroga*, *supra*, 16 Cal.App.4th at p. 964.) The defendant "stood up from a couch and started to walk into the hallway," prompting an officer to "order[] him to sit back down on the couch." (*Ibid.*) The defendant "argued before complying" and was " 'uncooperative,' " telling the officers they needed a warrant before he " '[f]inally' " sat down. (*Ibid.*) The defendant continued to vociferate that the police lacked a legal right to be in the apartment and he appeared to try to hide something in the couch; the same officer therefore ordered him "to put his hands on his lap." (*Ibid.*) The

12

defendant was again " 'very uncooperative' but 'finally' obeyed the order." (*Ibid.*)  The officer then ordered the defendant to stand up, which the defendant refused "several times," complying only once the officer " 'pulled on his arm.' "  (*Ibid.*)  This court found such prearrest conduct—i.e., verbal criticism and grudging compliance with police orders—failed to justify a charge of violating section 148.  (*Id.* at p. 966.)  The court expounded, "It is true that [defendant] complied slowly with [the officer's] orders, but it surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders."  (*Ibid.*)  The *Quiroga* defendant's prearrest conduct mirrors Garcia's conduct here, except Kelleher did not need to touch Garcia to get him to move.

The People respond that, "[u]nlike the defendant's prearrest conduct in *Quiroga*, [Garcia] did not argue to Kelleher that Kelleher's instructions were unconstitutional, required a warrant, or otherwise reflected appellant's effort to vindicate his Constitutional rights."  But Garcia was entitled to exercise his First Amendment rights without expressly invoking them.[3] (See *Chase C.*, *supra*, 243 Cal.App.4th at p. 115 [criticism is protected speech].)

The People also state "the jury heard Kelleher's reasonable suspicion for the stop."  But the lawfulness of Kelleher's stop is not in dispute;[4] the issue is whether Garcia "delayed" Kelleher's investigation.  Kelleher

---

[3] We also observe that Kelleher's testimony did not describe Garcia's protestations in detail, and, as the People admit, "there was no sound on the video" as shown to the jury.

[4] Garcia stipulated the search was lawful.  For their part, the People do not argue on appeal that Kelleher had probable cause to arrest Garcia before dispatch relayed his outstanding warrants.

testified he made a lawful order only after Garcia was already walking "at a fast pace up the driveway" and not until Kelleher "got closer to [Garcia]" while following him. At that point, Garcia protested that "he wasn't doing anything wrong" but he did comply, albeit slowly. We do not read section 148 as criminalizing this slow response to an investigatory stop under these circumstances.

*Chase C.* elucidates that an inconsequential slowdown caused by uncooperativeness generally does "not delay or obstruct a peace officer in the discharge of any duty *within the meaning of the statute.*" (*Chase C.*, *supra*, 243 Cal.App.4th at p. 116, italics added.) In *Chase C.*, the court scrutinized several analytically distinct interactions between Chase and the police. (*Id.* at p. 114.)[5] In a *postarrest* interaction with the police, "Chase refused to give his name or his parents' information on scene." (*Id.* at p. 112.) Chase cursed at the officer and challenged the basis of his arrest, but "Chase did not at any time, however, physically resist"; and, once placed in the patrol car, "Chase became 'extremely' cooperative and remained so while at the station." (*Ibid.*) The court held that Chase's refusal to identify himself "constituted a simple delay in responding to a directive from a police officer while engaging in protected speech. Viewed in the light most favorable to the judgment, Chase did little more than curse, verbally protest, and delay providing identification." (*Id.* at p. 119.) The court

---

[5] In one of the prearrest interactions, Chase witnessed the police detain a suspect and saw the suspect resisted arrest, at which point Chase cursed at the officers and told a suspect not to comply with their orders. (*Chase C.*, *supra*, 243 Cal.App.4th at pp. 111–112.) The Fourth District explained that because the suspect "was resisting *prior* to Chase's comments, and continued resisting long after the two were separated, there [was] no evidence in the record that Chase obstructed or delayed" the arresting officer. (*Id.* at p. 115.)

14

expounded that "Chase eventually complied" and his "eventual cooperation en route to the station is dispositive" because "preceding a booking interview, the Fifth Amendment renders a suspect 'free to refuse to identify himself or to answer questions' without violating section 148." (*Ibid.*) Any delay here was likewise de minimis.

*In re Muhammed C.* (2002) 95 Cal.App.4th 1325 is distinguishable because the defendant diverted police resources. There, an arrestee was placed in the back of a patrol car with the back window partially down. (*Id.* at p. 1328.) The defendant approached the patrol car and spoke to the arrestee, causing officers to order the defendant to move away. (*Ibid.*) Rather than do so, the defendant "extended his right hand out to the back, raising his palm towards the officers." (*Ibid.*) Officers then warned him "to step away from the patrol car or the officers would take him to jail," requiring an officer who had been processing the arrestee's car "to cross the street and approach [the defendant]" and repeat the same command. (*Ibid.*) Thus, the officer was "interrupted [from] processing [the arrestee's] car to attend to [the defendant]." (*Id.* at p. 1330.) Here, in contrast, Garcia's conduct did not "distract[]" Kelleher from other duties. (*Ibid.*) And Garcia did not "speak[] to a detained suspected criminal in police custody"— conduct that *In re Muhammed C.* explicitly distinguished from "a mere verbal challenge to police officers." (*Id.* at p. 1331.)

We conclude under the specific circumstances of this case that the evidence is insufficient to sustain the jury conviction for the charged violation of section 148. We do not state a broad proposition that slow response to prearrest law enforcement orders, in all circumstances, is insufficient to support the delay prong of section 148. But here, the officer testified that Garcia did not put up passive physical resistance, and the

15

video evidence shows Garcia merely argued with Kelleher and took less than 10 seconds to stand up in compliance with Kelleher's orders before he proceeded at a languid pace. In light of the video evidence, Kelleher's testimony regarding Garcia's unhurried response is insufficient to supply substantial evidence in support of a violation of section 148, and the judgment therefore will be reversed with regard to this conviction.

## 2. Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Garcia's Prior Drug Convictions

Garcia contends the trial court abused its discretion in denying his motion to exclude evidence of his prior drug convictions. Specifically, Garcia argues the evidence of his prior convictions "painted a picture of Garcia having done this before, therefore he must have done it again." Garcia does not appear to contend that the trial court abused its discretion in holding the evidence was admissible under Evidence Code section 1101, subdivision (b). (See *People v. Avila* (2006) 38 Cal.4th 491, 586 ["evidence of a person's prior criminal act is admissible 'when relevant to prove some fact (such as . . . intent, . . . knowledge . . . ) other than his or her disposition to commit such an act' "].) Rather, Garcia's challenge focuses on the trial court's balancing under Evidence Code section 352. In essence, he disagrees with the court's conclusion that his drug priors would not inflame the jury's passions, and he suggests the jury disregarded the court's limiting orders.

We review rulings made under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' " (*Id.* at pp. 1328–1329.)

16

The trial court did not abuse its discretion here. Case law in drug offense prosecutions establishes that evidence of prior drug convictions is generally admissible to show the defendant's knowledge of a drug's narcotic nature and intent to sell. (*Williams*, *supra*, 170 Cal.App.4th at p. 607; *People v. Pijal* (1973) 33 Cal.App.3d 682, 691.) Accordingly, to the extent Garica does challenge the court's admissibility determination under Evidence Code section 1101, subdivision (b), his challenge is without merit.

As the trial court explained, the prosecution bore the burden of establishing Garcia's knowledge and intent. Garcia's prior convictions of drug offenses were nearly identical to the charges against him, and therefore provided substantial probative value regarding his knowledge and intent. (*People v. Jefferson* (2015) 238 Cal.App.4th 494, 507 (*Jefferson*) [probative value of evidence establishing knowledge informed by "the logical chain connecting the challenged evidence to the disputed issue"]; *People v. Lewis* (2001) 25 Cal.4th 610, 636–637 [" 'The least degree of similarity is required to establish relevance on the issue of intent' "].)

This logic holds for purposes of Evidence Code section 352. But a finding of substantial probative value does not end our inquiry on that front. (*Foster*, *supra*, 50 Cal.4th at p. 1328.) Even if admissible under Evidence Code section 1101, "the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)' " (*Ibid.*)

There was no undue prejudice to Garcia. Garcia does not explain how evidence of his prior convictions would tend to create an emotional bias against him. (See *Foster*, *supra*, 50 Cal.4th at p. 1331 [" 'Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely

17

tends to evoke an emotional bias against a party as an individual' "
[citation] or if it would cause the jury to " ' "prejudg[e]" a person or cause on
the basis of extraneous factors.' " [Citation.]' "].)  Moreover, he acknowledges
his convictions "were not remote and jury convictions had been obtained"—
circumstances that mitigate prejudice.  (*People v. Ortiz* (2003)
109 Cal.App.4th 104, 118 [proof of conviction "minimize[s] the chance a jury
would punish [the defendant] for the prior offense"].)  Garcia fails to find
fault in the trial court's limiting instruction, which informed the jury that
the evidence could be considered only on the issues of knowledge and intent,
and it could not be used for any other purpose.  That instruction also
mitigated any prejudicial impact.  (*People v. Lewis*, *supra*, 25 Cal.4th at
p. 637.)

Garcia merely makes the conclusory assertion that "the net effect was
to paint a sign on Garcia which said 'drug dealer.' "  This presupposes the
jury ignored the court's limiting instructions, which, absent other evidence,
we presume they understood and followed.  (*People v. Pearson* (2013)
56 Cal.4th 393, 414.)

Garcia's reliance on *Jefferson* is misplaced.  There, Division Five of
this court concluded the defendant's prior act of lawfully possessing a
firearm was not admissible under Evidence Code section 1101,
subdivision (b), because it had "no tendency to prove" that the defendant
controlled a car in which law enforcement earlier found a stolen firearm,
and because the failure to instruct the jury on applicable firearm laws
precluded potential "inferences about how acquisition of the registered
firearms differed from acquisition of the charged firearm."  (*Jefferson, supra,*
238 Cal.App.4th at p. 506.)  The court further held the evidence should have
been excluded under Evidence Code section 352 because, "[t]hough arguably

18

relevant, the probative value of the evidence that on two occasions Jefferson possessed registered firearms in establishing that Jefferson knew the charged firearm had been stolen is vanishingly slight." (*Id.* at p. 507.) In contrast, there was substantial similarity between Garcia's prior convictions of drug offenses and the instant charges, which were strongly and directly probative of Garcia's knowledge of the drug's narcotic nature and his intent to sell. (*Williams*, *supra*, 170 Cal.App.4th at p. 607.)

## DISPOSITION

The judgment is reversed with regard to Garcia's conviction for violating section 148. The judgment is affirmed in all other respects.

SIMONDS, J.*

WE CONCUR:

BROWN, P. J.
STREETER, J.

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.